

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DENNIS LEE ALLEN, | § | No. 08-13-00302-CR |
| Appellant, | § | Appeal from the |
| v. | § | 15th District Court |
| THE STATE OF TEXAS, | § | Of Grayson County, Texas |
| Appellee. | § | (TC# 058167) |
| | § | |

**O P I N I O N**

Appellant Dennis Lee Allen was convicted of two counts of indecency with a child by sexual contact. *See* TEX.PENAL CODE ANN. § 21.11(a)(1)(West 2011). The offenses were enhanced to first degree felonies, and the trial court sentenced Allen to ten years' confinement on each count to be served concurrently. On appeal, Allen contends the trial court abused its discretion in admitting into evidence an audio recording of his telephone call with one of the victims and a video recording of his interview by a police detective. We conclude the trial court did not abuse its discretion and affirm the judgment.[1]

**SUMMARY OF THE EVIDENCE**

---

[1] This appeal was transferred from the Fifth Court of Appeals pursuant to a docket equalization order issued by the Texas Supreme Court. We apply the precedent of the Fifth Court as required by TEX. R. APP. P. 41.3.

Allen was charged with two counts of sexual contact with a child, one involving T.B. with the contact beginning in January 1992, and the other involving F.B. beginning in January 1995. Allen began living with T.B., F.B., their mother, and their brother in 1991. T.B. testified that Allen began touching her inappropriately when she was 4 years old and continued to touch her hundreds of times until she was almost 12. T.B. first made an outcry to her mother when she was 13. She reported the abuse to her husband after she had children of her own and realized Allen was being left alone with her own daughter. In 2008 when T.B. was 22 years old, she reported the abuse to Detective Robby Carney at the Denison Police Department. F.B. testified that Allen began abusing her when she was about 5 years old, and continued to abuse her until she was about 13. F.B. told her mother about the abuse when she was 17 or 18, and shortly thereafter, made a police report to Detective Carney in 2008. Detective Carney testified that T.B. and F.B. reported the offenses to him on October 2, 2008. He took their statements and arranged a "consent" telephone call by T.B. from his office in an attempt to get a confession from Allen. Carney testified that the purpose of the call was for T.B. to accuse Allen and elicit a response. Detective Carney put the call on speaker phone and taped the conversation. The recording of the telephone call was played to the jury over objection. In the recording, Allen denied ever touching F.B., but admitted he touched T.B. accidently, for which he apologized.

After the call, Detective Carney asked Allen to speak to him, and when Allen agreed, Carney picked Allen up at his house and drove him to the police station for a video-recorded interview. Carney did not inform Allen of his *Miranda* rights prior to the interview. The video of the interview was admitted into evidence and played to the jury over objection. In the interview, Allen generally denied the sexual abuse allegations although he said he may have

2

accidentally touched T.B. with his hands and penis when she crawled into bed with him. At one point during the interview, Allen asked if he could go, and Detective Carney said he could, but the interview continued. The interview was terminated when Allen later stated he "would really like to go home right now."

Allen testified at trial that he had been shot in the head in 1982 and was physically and mentally disabled, and that soon after his arrest, he was examined by a psychiatrist and was "found incompetent" and sent to a facility for 60 days in order to understand the process he was going through. He claimed he did not understand the questions posed by Carney during the interview or even why he was being asked those questions. He said he was without his medication in 2008 and was a "total wreck." Consistent with his telephone call with T.B. and his statement to Detective Carney, Allen testified that any sexual touching that may have occurred was accidental.

## DISCUSSION

### Recorded Telephone Call with T.B.

In his first issue, Allen contends the trial court erred in admitting the recording of the telephone call between him and T.B. Allen asserts Detective Carney's recording of the telephone conversation constituted the "intercept" of a "wire communication," as defined by Article 18.20 of the Texas Code of Criminal Procedure,[2] making it an illegally obtained wiretap under Section 16.02 of the Texas Penal Code[3] and therefore inadmissible under the exclusionary rule statute, Article 38.23(a) of the Texas Code of Criminal Procedure.[4]

---

[2] *See* TEX.CODE CRIM.PROC.ANN. art. 18.20, § 1(1,3)(West Supp. 2014) (defining "wire communication" and "intercept").
[3] *See* TEX.PENAL CODE ANN. § 16.02(b)(1)(West Supp. 2014) (forbidding the intentional intercept of a wire communication).
[4] *See* TEX.CODE CRIM.PROC.ANN. art. 38.23(a)(West 2005) (providing that no evidence obtained in violation of the laws of Texas can be admitted into evidence against the accused in a criminal case).

*Standard of Review*

We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard. *Cameron v. State,* 241 S.W.3d 15, 19 (Tex.Crim.App. 2007); *see also Jean v. State*, No. AP-76,601, 2013 WL 3282956, at *3 (Tex.Crim.App. June 26, 2013), *cert. denied*, 134 S.Ct. 1008 (2014). Because trial courts are in the best position to decide questions of admissibility, appellate courts uphold a trial court's admissibility decision when that decision is within the zone of reasonable disagreement. *Cameron,* 241 S.W.3d at 19. An appellate court may not reverse a trial court's decision regarding the admissibility of evidence solely because the appellate court disagrees with the decision. *Id*. "[T]he trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case." *Ramos v. State*, 245 S.W.3d 410, 418 (Tex.Crim.App. 2008).

*Analysis*

Allen concedes that Section 16.02 of the Penal Code provides an affirmative defense to prosecution when a person acting under color of law intercepts a wire communication if one of the parties to the communication has given prior consent to the interception. TEX.PENAL CODE ANN. § 16.02(c)(3)(A). He argues, however, that a question remains whether an "affirmative defense to prosecution" actually decriminalizes the act of interception. One court of appeals has noted the contention that conduct is in violation of statutory law for purposes of Article 38.23(a) if it violates the basic proscription in Section 16.02 prohibiting the intentional interception of a wire communication even if the conduct is subject to an affirmative defense. The court did not reach the merits of this issue, however, because at the time of the police conduct involved, the statute provided that one-party-consent was an "exception" to prosecution rather than an affirmative

4

defense. *Hernandez v. State*, 938 S.W.2d 503, 505-06 (Tex.App. – Waco 1997, pet. ref'd) (commenting that its decision was not to be read as holding that a different result would be reached under a statute creating an affirmative defense).

Since the *Hernandez* decision, however, the Court of Criminal Appeals has concluded in an analoguous circumstance that a victim's prior consent to law enforcement's recording their conversation with the defendant makes the interception legal under Section 16.02 and the recording admissible. *Alameda v. State*, 235 S.W.3d 218, 223 (Tex.Crim.App. 2007) (holding the recording admissible because the victim's mother gave vicarious consent to law enforcement to record her daughter's conversation with the defendant). The courts of appeals have followed suit. *See, e.g., Mitchell v. State*, No. 03-09-00643-CR, 2010 WL 5019123, at *1 (Tex.App. – Austin Dec. 8, 2010, no pet.) (citing the affirmative defense of consent under Section 16.02(c)(3)(A) and concluding interception of telephone conversation between the defendant and the victim, recorded by law enforcement after the victim agreed to participate in a controlled call, did not violate state or federal wiretap laws and was not inadmissible under Article 38.23(a)); *see also Dekneef v. State*, 379 S.W.3d 423, 431-32 (Tex.App. – Amarillo 2012, pet. ref'd) (citing the affirmative defense of consent under Section 16.02(c)(3)(A) and concluding the officer's recording of a telephone conversation in which the defendant confessed to sexually abusing the victim did not violate the wiretap statute as to render recording inadmissible at trial).

We agree with Professor George Dix that whether conduct is in violation of Texas law under Article 38.23(a) "should depend upon whether – considering the elements of the offense and exceptions, defenses, and affirmative defenses – the person obtaining the evidence could have been convicted under the statute for the conduct involved," and that no possible policy furthered

by Article 38.23(a) would be furthered by drawing any distinction between conduct subject to an exception and conduct subject to an affirmative defense. 40 Tex.Prac., Criminal Practice & Procedure § 7:24 at n.11 (3d ed.).

Allen also argues that while T.B.'s participation in the telephone call to Allen "was significant," there should be other evidence of consent. The evidence shows that T.B. knowingly participated in the telephone call with full knowledge that Detective Carney was recording the conversation. The sole case cited by Allen in this regard recognizes that consent to interception of a wire communication can be inferred from a knowing participation in the telephone call being recorded. *United States v. Axselle*, 604 F.2d 1330, 1338 (10th Cir. 1979) ("the circumstances shown by the testimony supported an inference of such consent[.]" since the victim "went ahead with the call 'after knowing what the law enforcement officers were about.'") (quoting *United States v. Bonanno*, 487 F.2d 654, 658-59 (2d Cir. 1973) (noting that to establish consent "it will normally suffice for the Government to show that the informer went ahead with a call after knowing what the law enforcement officers were about")). Further, Detective Carney described the call as a "one party consent telephone call" in which he had T.B. use her cell phone to contact Allen. We conclude the trial court could have properly inferred from these facts alone that T.B. consented to the recording of her telephone conversation with Allen. *Cf. Mitchell,* 2010 WL 5019123, at *1 (holding the recording was legally obtained and the trial court did not abuse its discretion in its admission when it was "recorded by law enforcement after the victim agreed to participate in a controlled call to assist the investigation").

Finally, Allen argues that since the call was designed to obtain a confession and no exigent circumstances were shown, a warrant to record the call should have been obtained. We disagree.

6

It is well settled that a warrant or order is not required for law enforcement to record a conversation with a suspect when, as here, a private party to the conversation has consented to the recording. *See, e.g., Casey v. State*, No. 14-04-01165-CR, 2006 WL 348164, at *4 (Tex.App. – Houston [14th Dist.] Feb. 14, 2006, no pet.) (memo op., do not publish) (citing Section 16.02(c)(3) and holding that "[w]hen one party to a conversation consents to the recording, recording that conversation does not require a court order[.]"); *McDuffie v. State*, 854 S.W.2d 195, 206 (Tex.App. – Beaumont 1993, pet. ref'd) (restrictions of wiretap statute do not apply when private individual consents to taping of conversation with defendant); *Esterline v. State*, 707 S.W.2d 171, 173 (Tex.App. – Corpus Christi 1986, pet. ref'd) (wiretap statute did not apply to tape recording of telephone conversation between informer and defendant, and court order was nor required for the tape to be admissible, where informer consented to taping of his conversation with defendant). Issue One is overruled.

## Recorded Interview with Detective Carney

In Issue Two, Appellant contends that the trial court erred in admitting his video-recorded interview with Detective Carney (1) because the interview was or became custodial and he was not given his rights under *Miranda* and Article 38.22 of the Texas Code of Criminal Procedure[5] and (2) because his statement was not freely and voluntarily made under Article 38.22 and Article 38.21[6] due to the harshness and deception employed by Detective Carney in the interview and Allen's mental state at the time.

---

[5] Article 38.22 establishes procedural safeguards for securing the privilege against self-incrimination. TEX.CODE CRIM.PROC.ANN. art. 38.22 (West Supp. 2014). It provides that no oral statement of an accused made as a result of a custodial interrogation is admissible against the accused in a criminal proceeding unless (1) the statement was recorded, and (2) prior to the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. *Id*. at art. 38.22, § 3.

[6] Article 38.21 provides that a statement of the accused may be used in evidence against him if it appears it was freely and voluntarily made without compulsion or persuasion. TEX.CODE CRIM.PROC.ANN. art. 38.21 (West 2005).

7

*Background*

While a formal motion to suppress was not filed, at a pretrial hearing, Allen's counsel argued the video recording of the interview should not be admitted because the interview had occurred "just prior to" Allen being held incompetent to stand trial, that Allen was "given probably one of the most brutal questioning periods that I have [ever] seen on tape," and because Detective Carney had indicated during the interview he had already made up his mind on guilt and never read Allen his rights. Court and counsel discussed whether the interview was custodial or at some point became custodial. After reviewing the recording of the interview, the trial court concluded the interrogation was "voluntary" because "the policeman indicates at the beginning [Allen] is free to leave if he wants to" and "doesn't have to answer anything," and because Allen "appeared to understand what was going on during the interview to me."

The beginning of the video recording of the interview shows Detective Carney offering Allen a drink, leaving Allen alone in the interview room, returning with a soft drink as requested, and then leaving once again before returning to start the interview. After Carney returns and obtains some identifying information from Allen, he has Allen confirm that he is there voluntarily on his "own free will," and that he understands he is not under arrest and "not being detained for any reason." Carney then informs Allen he is investigating accusations that Allen touched his two stepdaughters, F.B. and T.B., in an inappropriate manner. Throughout the interview, Detective Carney is conversational and non-threatening, asking his questions in a forceful but non-aggressive manner. Allen appears calm and alert, answering Carney's questions with quick, relevant answers, showing his understanding of the situation and the questions being asked. Allen is consistent throughout the interview. He consistently denies ever touching F.B.; he denies

8

penetrating anyone's mouth, vagina, or anus with his penis or finger; and he denies ejaculating on anyone; his only admission is that he may have accidently touched T.B. with his hands or his penis when she got into bed with him. Allen admits he told T.B. he "was sorry if anything had ever . . . happened because I never meant for anything to happen" and that he explained to her he was asleep and didn't realize he touched her. At one point, Allen states that he is mentally and physically disabled but acknowledges that he knows the difference between right and wrong. When Allen tells Carney he is "sorry if you think I'm guilty," Carney immediately replies "That is not what I am getting at here." Mid-way through the interview, Carney again confirms with Allen that he understands he is free to go, not under arrest, and not being detained. Carney tells Allen that when the interview is over, he will drive him back home. About 20 minutes into the interview when Carney states "you will be free to go here today. I'm not going to arrest you," but "I am not saying that you might not get in trouble for it later," Allen asks "Can I go now?" Carney immediately replies: "Sure. If that is what you want to do." Allen indicates "That is what I would like to do," but then continues the conversation. From that point on, Allen's incriminating statements are essentially consistent with what he has already admitted. Allen admits he knows touching little kids is wrong, that he made a mistake, and that he apologized to his daughter for making that mistake. He admits the only thing that could have happened was accidently touching T.B. with his hands or penis. After the interview has lasted about 40 minutes, Allen says there is nothing else to tell, and he "would really like to go home right now," and the interview is terminated.

*Standard of Review*

9

We review a trial court's ruling refusing to suppress evidence for an abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex.Crim.App. 2010); *Ramos*, 245 S.W.3d at 417–18. In reviewing the trial court's decision, we view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex.Crim.App. 2006). We afford almost total deference to a trial court's determination of historical facts, but review pure questions of law de novo. *Alford v. State*, 358 S.W.3d 647, 652 (Tex.Crim.App. 2012). Likewise, we give almost total deference to a trial court's resolution of mixed questions of law and fact if those questions turn on the credibility and demeanor of witnesses. *Id*. However, if credibility and demeanor are not necessary to the resolution of a mixed question of law and fact, we review the question de novo. *See id*.; *Young v. State*, 283 S.W.3d 854, 873 (Tex.Crim.App. 2009). This same deferential standard of review applies to a trial court's determination of historical facts, demeanor, and credibility even when that determination is based on a videotape recording. *State v. Duran*, 396 S.W.3d 563, 570 (Tex.Crim.App. 2013). The trial court's ruling will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Ramos*, 245 S.W.3d at 418.

*Custodial Interrogation*

The threshold issue is whether Allen's interview amounted to a custodial interrogation. *Miranda* requires that the accused be properly admonished of certain constitutional rights in order for his statements "stemming from custodial interrogation" to be admissible as evidence against him. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Likewise, Article 38.22 provides that no oral statement of an accused "made as a result of custodial interrogation" is admissible unless the accused is warned of his rights during the recording but

10

before making the statement, and the accused knowingly, intelligently, and voluntarily waives those rights. TEX.CODE CRIM.PROC.ANN. art. 38.22, §§ 2(a), 3(a)(2). Article 38.22 specifically provides that it does not preclude the admission of statements that do not stem from custodial interrogation. *Id*. at § 5.

Allen was not warned of his rights during the recorded questioning by Detective Carney, and he asserts he was in custody at that time. The State contends Allen was not in custody during the interview and the trial court did not err in overruling Allen's objection to admission of the recording. The defendant bears the burden to prove a statement was the product of a custodial interrogation. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex.Crim.App. 2007).

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *see Bass v. State*, 723 S.W.2d 687, 690-91 (Tex.CrimApp. 1986) ("custodial interrogation" as used in Article 38.22 was intended to be construed consistently with its meaning under the Fifth Amendment of the United States Constitution).

To determine whether an individual is in custody, a court must first examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1529 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App. 1996). This determination of custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323, 114 S.Ct. at

11

1529. After the circumstances surrounding the interrogation are considered, the court must determine whether, "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465 (1995); *see also Herrera*, 241 S.W.3d at 525.

The Court of Criminal Appeals has identified four general situations that may constitute custody:

> (1) when the suspect is physically deprived of his freedom of action in any significant way;
>
> (2) when a law enforcement officer tells the suspect that he cannot leave;
>
> (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted;
>
> and
>
> (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

*Dowthitt*, 931 S.W.2d at 255. The determination of custody is made on an ad hoc basis after considering all of the objective circumstances. *Id.*

After reviewing the video-recorded questioning of Allen, we cannot conclude that it would meet any of the four custodial situations outlined by the Court of Criminal Appeals in *Dowthitt*. Allen was not physically deprived of his freedom of action in any significant way, and was twice left alone in the open interview room. Allen acknowledged he came to the police station voluntarily, and he acknowledged three times his understanding that he was not under arrest or being detained and was free to go. Allen was never physically restrained. The questioning lasted around 40 minutes. Detective Carney did not create a situation that would lead a

12

reasonable person to believe that his freedom of movement was significantly restricted. Allen's freedom of movement was not restricted to a degree associated with an arrest.

Although Detective Carney did indicate to Allen that there was probable cause to arrest by telling him that he had "pretty much admitted to it on tape" and "I know you did it," when Allen said he was sorry Carney thought he was guilty, Carney immediately stated "That is not what I'm getting at here," and afterward emphasized to Allen that he was not under arrest or being detained and was free to go. Based on the totality of the circumstances, we cannot conclude that Detective Carney's statements about the evidence and his belief "would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest."

Nor did the interview become custodial when the interview continued after Allen asked "Can I go now?" *See Dowthitt*, 931 S.W.2d at 255 (questioning that begins in a noncustodial environment can become custodial in nature at some later point during the interrogation). Just before his inquiry, Allen had been reminded that he was free to go, and after Allen's inquiry, Carney immediately responded that Allen was free to go if he wanted. Further, while Allen initially indicated he would like to leave, Allen himself then continued the conversation and subsequently responded freely to Carney's follow-up questions. The Court of Criminal Appeals has recognized that when a suspect is not in custody, law enforcement officials have no obligation under *Miranda* to scrupulously honor a request to terminate questioning, but rather the police "are free to attempt to persuade a reluctant suspect to talk, and the immediate termination of the interrogation after the invocation of rights is simply not required." *Estrada v. State*, 313 S.W.3d 274, 296 (Tex.Crim.App. 2010) (quoting *Davis v. State*, No. AP-74,393, 2007 WL 1704071, at *5 (Tex.Crim.App. June 13, 2007)).

13

Reviewing the interview in its totality, we conclude that the objective circumstances of the questioning were noncustodial in nature, and therefore Allen's statements did not stem from a custodial interrogation and he was not improperly deprived of his rights and warnings under *Miranda* and Article 38.22. The case at hand is similar to many cases considered by the United States Supreme Court and the Court of Criminal Appeals, all of which have come to the conclusion that the accused was not in custody during questioning, and thus not entitled to *Miranda* or Article 38.22 warnings.[7] In these cases, the accused voluntarily came to the police station, was either told he or she was not under arrest or was free to leave, was told he or she did not have to answer any questions, and then the accused was allowed to leave the station house after making incriminating statements.

*Voluntary Statement*

The Court of Criminal Appeals has made clear that the mandate in Article 38.22 that statements be voluntary applies to both an accused's custodial and noncustodial statements because it provides that only "voluntary" statements may be admitted. *Oursbourn v. State*, 259 S.W.3d 159, 171 (Tex.Crim.App. 2008). Claims of involuntariness under Article 38.22 can be predicated on both police overreaching and on the state of mind of the criminal defendant. *Id*. at 172. The question to be asked is "Does it appear – as Article 38.21 requires – that the statement was freely and voluntarily made without compulsion or persuasion?" *Id*. The Court of Criminal Appeals instructs that in analyzing the defendant's state of mind, conditions caused by illness, medication, mental disability, mental capacity, and intoxication can be considered as factors in determining whether the statement was voluntary. *Id*. at 172-73.

---

[7] *See, e.g., California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 493–95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Estrada*, 313 S.W.3d at 288–95; *Gardner v. State*, 306 S.W.3d 274, 293–95 (Tex.Crim.App. 2009); *Meek v. State*, 790 S.W.2d 618, 620 (Tex.Crim.App. 1990).

As a general rule, a determination whether a statement was voluntarily rendered is analyzed by examining the totality of the circumstances. *Arizona v. Fulminante,* 499 U.S. 279, 285–86, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991); *see Delao v. State*, 235 S.W.3d 235, 239 (Tex.Crim.App. 2007). And, as discussed above, a trial court's ruling on the suppression of evidence is reviewed for an abuse of discretion. *Ramos,* 245 S.W.3d at 417-18.

We note that our review of the video recording in particular is somewhat limited because in answering the issue of voluntariness we must analyze Detective Carney's demeanor in asking the questions and Allen's demeanor in answering those questions. The trial court concluded from its review of the video recording that Allen "appeared to understand what was going on during the interview[.]" And we can assume the trial court concluded that there was nothing about Carney's tone or manner that was so over bearing as to render Allen's statement involuntary. We are required to give almost total deference to the trial court's determination of demeanor even when that determination is based on a video recording. *See Duran*, 396 S.W.3d at 570. Applying this "almost total deference" standard, we conclude that the trial court did not abuse its discretion in finding and concluding that Allen's statement was voluntary.

We are not persuaded that Allen's statement was rendered involuntary either by the alleged harshness and deception employed by Detective Carney in the interview or Allen's mental state at the time. In fact, our review of the video recording shows that throughout the 40-minute interview, Detective Carney is conversational and non-threatening, asking his questions in a forceful but non-aggressive manner. Allen appears calm and alert, answering Carney's questions with quick, relevant answers, showing his understanding of the situation and the questions being asked. Also, Allen is consistent throughout the interview, demonstrating his intellectual grasp of

15

the situation. Despite the pointed questioning, Allen consistently denies ever touching F.B.; he denies penetrating anyone's mouth, vagina, or anus with his penis or finger; and he denies ejaculating on anyone; his only admission – which also remains consistent throughout the interview – is that he may have accidently touched T.B. with his hands or his penis when she got into bed with him. At one point, Allen states that he is mentally and physically disabled but acknowledges that he knows the difference between right and wrong.

While Detective Carney testified at trial that he employed an interrogation technique where deception is used by accusing the suspect of a more serious crime to invoke a response, it is apparent that to the extent that technique was utilized, it did not amount to overreaching. As the Court of Criminal Appeals has noted, police overreaching that renders a statement involuntary and inadmissible involves extreme fact scenarios such as: (1) the suspect being subjected to a four-hour interrogation while incapacitated and sedated in an intensive-care unit; (2) a medicated suspect being interrogated for over eighteen hours without food, medication, or sleep; (3) police officers holding a gun to the head of a wounded suspect to extract a confession; (4) suspect being held for four days with inadequate food and medical attention; and (5) suspect being questioned for thirty-six hours without sleep. *Oursbourn*, 259 S.W.3d at 170-71 (citing *Colorado v. Connelly*, 479 U.S. 157, 164 n.1, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). Nothing in this record shows similar police behavior that would render Allen's statement involuntary.

Allen testified at trial that he had been shot in the head in 1982, was physically and mentally disabled, and that right after his arrest, he was examined by a psychiatrist and was "found incompetent" and sent to a facility for 60 days in order to understand the process he was going through. He claimed that he was without his medication in 2008 and did not understand the

16

questions posed by Carney during the interview or even why he was being asked those questions. As noted above, however, the video shows that during the interview Allen was calm, alert, and quick to provide relevant and consistent answers under pointed questioning, demonstrating his understanding and intellectual grasp of the situation and indicating his mental condition at the time did not render his statement involuntary. Further, contrary to the contentions of Allen and his counsel that he was found incompetent to stand trial shortly after giving his recorded statement, the record shows Allen was found incompetent to stand trial on June 28, 2009, over eight months after the interview took place. Moreover, the record also shows that before his statement in October 2008, Allen had been previously declared competent to stand trial in March 2007.

Having considered the totality of the circumstances and having applied the deferential standard of review required, we conclude that the trial court did not abuse its discretion in finding Allen's statement was voluntary and in admitting the video recording of his interview into evidence. Issue Two is overruled.

## CONCLUSION

Finding no error in admitting the evidence, we affirm the judgment.


STEVEN L. HUGHES, Justice

May 8, 2015

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Publish)

17