**AFFIRMED; Opinion Filed July 18, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00576-CR

### DELMAR ALFREDO FLORES, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 380th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 380-82105-2013**

## MEMORANDUM OPINION

Before Justices Lang, Myers, and Stoddart
Opinion by Justice Myers

A jury convicted appellant Delmar Alfredo Flores of aggravated sexual assault of a child under the age of fourteen and assessed punishment at five years' imprisonment.[1] In two issues, he contends the trial court erred by denying his motion to suppress and that the evidence is insufficient to support the conviction. We affirm.

### BACKGROUND

When she was in the fifth grade, the complainant in this case, A.R., reported to her elementary school counselor that her mother had been hitting her. During the Child Protective Services (CPS) investigation that followed, A.R said she had been sexually abused by appellant, her stepfather. As a result of these allegations, CPS contacted the Plano Police Department and

---

[1] This was the second trial of this case. In the first trial, the trial court declared a mistrial because the jury was deadlocked.

A.R. was taken to the Children's Advocacy Center (CAC) for a forensic interview. The forensic interview took place on March 1, 2013, when A.R. was eleven years old. Detective Chris Jones was assigned to the case, and he watched the interview via closed circuit television. During the interview, A.R. alleged not only physical abuse by her mother and sexual abuse by appellant, but also that her teenaged stepbrother, M.R., appellant's biological son, penetrated her female sexual organ with his mouth and finger. When Detective Jones interviewed M.R. about A.R.'s allegations, "[h]e confessed to committing the offenses as [A.R.] described."

Detective Jones obtained a warrant for appellant's arrest, and CPS arranged for him to meet with the detective at the CAC on March 4, 2013. Jones testified that appellant came to the CAC voluntarily. The detective did not tell appellant he had a warrant for his arrest. Detective Jones read appellant his *Miranda* rights and appellant waived his rights and agreed to speak with the detective. The interview was recorded and published to the jury.

Detective Jones began the interview by explaining he had been assigned to investigate this case. He asked appellant if he knew why he was there. Appellant replied that "all this caught me by surprise" and that his ex-wife, Yolanda, called him, crying, saying "hey this is going on." Appellant told her "I don't know," and Yolanda said she did not know exactly what was going on either. Yolanda started explaining to him "what was going on." Appellant said all he knew was that A.R. had ended up at the CAC because she complained to her school about getting a spanking. He said that A.R. "talked about—I don't know—I mean up to there I know." When Detective Jones asked if appellant knew what A.R. said at the CAC, appellant answered, "I have no clue. I haven't talked to her; I haven't seen her." Appellant agreed with Jones that because appellant drove himself to the CAC, he wanted to "talk about it" and wanted "to know what's going on."

Detective Jones told appellant that he had to read him his rights because A.R. had

mentioned appellant's name in her forensic interview. The detective added, "[I]t is a criminal investigation that we're conducting, alright?" Appellant replied, "Okay." Detective Jones told appellant that "[i]f at any time you have any question about your rights ask me, and I'll answer to the best of my ability, okay?" Appellant nodded his head and said yes. After Detective Jones read the statutory rights, he asked appellant, "Do you understand what I just told you?" Appellant replied, "Yeah." Detective Jones then explained, "I mean basically if you don't want to talk to me, you don't have to, okay? If you feel uncomfortable with a line of questioning you can ask for an attorney, okay?" Appellant replied, "Okay." When Detective Jones asked again if appellant understood everything he just read, appellant said, "Yeah," and asked if he was under arrest. Detective Jones responded, "Uh, not right now at this moment." Appellant said, "Okay." Detective Jones then read the wavier of rights portion of the warnings. After doing this, he stated: "Now, I just read a lot of stuff, and if I was in your shoes, I wouldn't know what half of it meant, so what I'm going to do is explain to you." Detective Jones explained:

> That means I'm not going to sit here and promise you that we're, [pause] . . . . If you were to admit to something we're not going to do something, we're not going to do anything to you, as far as criminally. I'm not going to sit here and say there won't be any charges filed on you.

Detective Jones said he was not going to "call a whole bunch of cops in here and kick you and beat you over the head until you tell us what we want to hear," adding, "It's not like that okay?" Detective Jones further stated: "I'm not gonna offer you any favors or anything like that, okay? I'm not gonna say tell me what I want to hear, and I'll let you walk, okay? You understand all that?" Appellant nodded his head and said yes.

Detective Jones then told appellant to initial each warning on the form to assure him appellant understood the warnings. Appellant told Detective Jones he could read, and he appeared to read the warnings in front of him, stating: "Yeah, it's pretty much what you've already read to me, right?" The detective replied, "Yeah, pretty much word for word."

Appellant initialed the warnings on the form in the places indicated.

Detective Jones asked appellant some background questions in order "to get to know you a little bit." Appellant, who was born in El Salvador, told Jones he was a truck driver and that he would typically stay with his ex-wife and children in their four bedroom house in Plano when he was not on the road, usually for only a couple of days at a time. Appellant explained that he was supporting his family financially and could not afford to maintain a separate residence. Appellant said he and his ex-wife no longer had any physical or sexual relationship. The detective also asked appellant about the living arrangements in the home—appellant usually slept in the living room—and where they had lived previously.

Detective Jones asked if appellant drank a lot, and appellant stated he did when he was at home. Appellant said he drank "Rum Bacardi" and beer. He agreed that he would get drunk when he was at home but that during the work week he did not drink that much. Appellant stated that when he drank too much, he would not remember things the next day. He agreed he had a drinking problem, but he also pointed out that, because he was a truck driver, he often had to do drug and alcohol testing under U.S. Department of Transportation rules, and he "had never had any problems before." The detective asked appellant whether he was an alcoholic, and appellant nodded his head and said "yes."

Detective Jones then told appellant they needed to talk "about the reason you're here." He asked appellant whether he "get[s] along with" A.R., and appellant said he did, but their relationship was "different than my kids; she's not my daughter." Appellant indicated that he had lived with A.R. since she was a baby and he was the only father she had ever known— A.R.'s biological father was not a part of her life. The detective asked appellant if he would have any reason to doubt A.R. if she came to him and told him she had a problem or something was going on with her, and appellant replied, "Uh, no." The detective asked appellant whether

he had ever known A.R. "to lie, tell any stories that aren't true," and appellant shook his head and said "no." The detective also asked if appellant would have any reason to doubt A.R. if she came to him and said something was bothering her, and appellant said if "anybody" came and talked to him he would believe them.

When Detective Jones told appellant A.R. had accused M.R. of sexually abusing her and M.R. had confessed, appellant became emotional and started crying. Detective Jones stated: "[W]e asked [A.R.] if anybody else has done anything like that to her, and she stated that you have, okay?" Still crying, appellant stated: "She played with me a lot, okay. Up to a certain point I let her play, however she wanted to play with me; but, uh, I have tried to correct this with her mom, you know, because she was just showing her boobies." Appellant also said, "[A]t a certain point she did, and I, uh, and I told her mom to discipline her about [showing her breasts to me]," but he added that A.R. was doing this to M.R. and appellant was "just watching."

Detective Jones read to appellant what A.R. said in her forensic interview, including that he had gotten down on the floor with her and kissed her private part on the outside of her clothes, that she could smell alcohol on his breath, and that he told her not to tell anyone because he would go to prison for a long time. When the detective asked if appellant recalled an incident like that ever happening, appellant stated: "No, no, like I say, if I do drink a lot, I might do things you know that, the next day I do not know what I did. I do not know exactly unless someone tells me because it happens to me so often that my kids tell me, 'Hey, you threw up there, go clean up your mess.'" Detective Jones asked appellant if he thought A.R. was lying "about this or making it up," and appellant stated: "Well, I tell you something. If she, if she [is] saying it, you know, and I, and she never brought it to me either."

After Detective Jones commented that A.R.'s allegation was "so specific" and that she was not saying penetration occurred or "anything like that," appellant replied: "Well, I'll tell

you something, um, that, okay, I mean, stuff like that, you know, I have to be really gone, you know, drunk . . . not to remember things like that." Detective Jones asked appellant if he ever got to the point where he was so drunk he could not remember, and appellant stated: "Yes, yes, not most of the time but sometimes I have." He stated that his children would remind him of things he had done, and "I don't doubt it, I probably did, I don't remember, it's not on my mind. Appellant added that "[y]ou, know, I mean I'm not afraid to talk to you or—," at which point Detective Jones stated:

> Understand we're trying to get your family the help that they need. Um, but the thing is, when we try to get your family the help that they need we've got to have the truth. If you're sitting here telling me you don't remember or you were too drunk but you don't doubt her, then, I mean, that's okay. I just, you know, what I need to know is if you do remember something like that happening?

Appellant said, "No" and then explained, "No, because like even she sometimes, she—I do remember, you know, she plays, okay, I mean, rough with me right now." Jones asked: "What does she do? You said earlier that she showed you her breasts or whatever." Appellant responded, "Yeah, that was a long time ago," and the detective asked, "Has she done anything else like that, acted out sexually toward you?" Appellant replied:

> Uh, yeah, uh, well she, not sexually maybe, but she slapped my back, my ass, you know, like that and she kept, keeps doing that sometimes, and I just know where to stop her, you know. If I'm, you know, in good in my brain, I know where to stop because she usually, she used to play like that with me, probably we're playing okay, and she's in the mood to play, do things with me, I'm probably carrying the baby, and she goes behind and pulls my pants just to see my ass and start running, running away, and I told her, "Hey, I'm going to do it to you. I'm going to do it to you," but I haven't ever done it to her because I know it won't be proper. She's a girl, you know, but uh she had done that to me all the time. You know, she gets in these play moods with me, and uh, but uh, like I say stuff like that. I've never thought in my whole life I would hear anything like that.

When Detective Jones asked appellant what he would tell A.R. about this if she were in the room "right now," appellant said "I guess I would tell her I'm sorry," and that he wished she would have approached him and talked to him.

Dr. Kristin Reeder, an attending physician at Children's Medical Center, performed the sexual abuse exam on A.R. on March 6, 2013, a few days after the forensic interview. The referring agency had provided her with some background information, which Dr. Reeder recorded in her medical notes as: "Per referral, 'fall or winter of 2012 [appellant] placed his mouth on [A.R.'s] vagina over the clothing. June of 2010—June 2012 [M.R.] placed his fingers on her vagina. [M.R.] confessed to placing his penis in her mouth and his mouth on her vagina.'" Dr. Reeder did not ask A.R. directly about her disclosures, but the doctor noted that A.R.'s mother "essentially" told her that A.R. said appellant "had touched her." Dr. Reeder testified that A.R.'s exam was "normal," meaning the doctor "did not identify any signs of trauma or infection." Dr. Reeder did not find this surprising because "90 percent of the exams that we do are completely normal." When sexual abuse occurs without any actual penetration it is uncommon for there to be trauma, and the kissing of the female sexual organ typically would not cause injury. Dr. Reeder was also not surprised there were no residual signs of M.R.'s abuse because the abuse had ended at least six months prior to the examination.

A.R. testified that she was fourteen years old at the time of trial and in the eighth grade. Appellant is her stepfather and A.R.'s stepsister, D.R., and her stepbrother, M.R., are appellant's biological children. A.R. testified that when she was eleven years old and in the fifth grade, appellant touched her inappropriately. It happened one night in the living room while she was sitting on the floor watching the Disney Channel on television. Appellant had been sitting on the couch. At some point, he turned off the television and moved over to her. When asked where appellant first touched her, A.R. stated she did not remember, and in response to the prosecutor's further questions about the offense, A.R. repeatedly stated "I don't know." When the prosecutor asked A.R. why she would tell the jury that appellant had touched her if she did not remember, A.R. stated, "I don't want to do this." The prosecutor asked, "Is there a reason you don't want to

do this?" A.R. again said, "I don't want to do this." The prosecutor asked, "Why not," and A.R. replied, "It's hard." She explained that it had been difficult on her family, particularly her half-sister and half-brother, who were forced to choose between her and appellant.

The prosecutor read the portion of Dr. Reeder's medical notes that stated: "[F]all or Winter of 2012 [appellant] placed his mouth on [A.R.'s] vagina over the clothing." The prosecutor asked if that sentence was true or not true, and A.R. said "[t]rue." The record also contains the following exchange:

> Q. And when this happened, when you said that he—[appellant] placed his mouth on your vaginal area over the clothing, did you feel a signal in your body?
>
> A. I don't know.
>
> Q. Did it feel right?
>
> A. No.
>
> Q. Did it feel wrong?
>
> A. Yes.

A.R. continued to say "I don't know" or "I don't remember" in response to further questions about the offense, and that the State had "ruined everything" because of the effect the case had on her relationship with her family. The prosecutor asked if there was anything A.R. had said in the courtroom that was a lie, and A.R. replied "[n]o." Then the following occurred:

> Q. Is it true that he put his mouth on your—
>
> A. Yes.
>
> Q. —vaginal area over the clothes? Any doubt in your mind about that?
>
> A. No.
>
> Q. Had he been drinking?
>
> A. Has he been drinking?
>
> Q. That night?
>
> A. Yes.

Q. A lot?

A. A lot?

Q. Had he been drinking a lot that night?

A. Yes—well, I don't know.

Q. Do you think he was drunk?

A. I don't know.

Q. Have you seen him drink a lot before?

A. Yes.

Q. Have you ever seen him drink to the point where the next morning he didn't remember what happened?

A. Yes.

Q. Have you ever seen him drink to the point to where he vomited or threw-up somewhere?

A. Yes.

A.R. did not deny that she told a teacher, a counselor, and a CPS investigator what had happened and that she never changed her story.

The State also called Dan Powers, a licensed sex offender treatment provider and senior vice president and clinical director for the CAC. He testified that he watched Detective Jones's interview with appellant and that the lack of an immediate denial of the allegation "was just kind of striking" because, in Powers's experience, "a somewhat normal reaction would be 'No, I didn't do that,' but there wasn't an immediate denial." Powers also found appellant's statement that A.R. showed him her "boobs" striking because "it was almost a deflection on the child. . . ." Powers testified it is "very common" for a child victim to be reluctant to testify in court. The child is asked to come to a courtroom and talk about very private and sexual things in front of a group of strangers, as well as the person who hurt them. In addition, the delay between the outcry and the trial makes it difficult for a child who has often moved on with their life, received

treatment, and is doing well, "to have to come back and hash all this up again." Powers also testified: "When a child is ready to move on with their life, again, like the abuse, they just want this all to go away. They didn't want to be abused, they didn't choose to be abused, they didn't choose to be in this courtroom either."

A.R.'s mother, Yolanda, testified for the defense that she married appellant in 1996 and that "[w]e were married a long time afterwards." They had two children: M.R., and a daughter, D.R. While she and appellant were separated, Yolanda had A.R. with another man. Although A.R. was not his biological daughter, appellant treated her the same as his other children. In 2011, appellant started living with them again to help with expenses. He was a truck driver, so he only stayed with them on weekends and slept in the living room. Yolanda testified that she and A.R. "had difficulties." They used to fight often and A.R. "would lie a lot." Yolanda believed A.R. was angry because her biological father was not part of her life.

Yolanda testified that she found A.R., who was in therapy, taking medication, and doing better, to be a truthful person now, but at the time these events were occurring she was not truthful and would lie. Yolanda also testified that she believed appellant was a truthful person and had never done anything against her or her children's best interest. She believed A.R. had been sexually abused by M.R. because he confessed, but as far as what had allegedly occurred between A.R. and appellant, Yolanda did not believe A.R. was being truthful in court. She acknowledged that appellant paid her $500 per month in child support, but she pointed out that her monthly expenses were greater than that and she depended more on other sources of income for her support.

The jurors ultimately found appellant guilty of aggravated sexual assault of a child and assessed punishment at five years' imprisonment.

DISCUSSION

## 1. Videotaped Statements

In his first issue, appellant contends the trial court erred by not granting his motion to suppress. More specifically, appellant argues that while Detective Jones "technically" followed the law, appellant never understood he had a choice to answer the questions posed by the detective, and he did not know the detective had already prepared an arrest warrant prior to the interview. Appellant also argues he did not understand the significance of the *Miranda* warnings that were read to him, and even if he had understood their significance "he was not privy to the fact that he would never leave the interview a free man."

During the suppression hearing, Detective Jones testified that appellant came to the CAC that day voluntarily and he was not under arrest at the time of the interview, but that an arrest warrant for appellant had been prepared before he arrived. Jones read appellant his *Miranda* warnings and gave him a written copy of the warnings, which appellant read, initialed, and signed. After the recorded interview was over, Detective Jones exited the room and contacted a Plano police patrol officer, who arrived at the CAC and arrested appellant pursuant to the warrant that had been obtained prior to the interview.

The trial court made the following findings and conclusions in accordance with article 38.22, § 6 of the Texas Code of Criminal Procedure:

> 1. On March 4, 2013, the defendant was interviewed by Detective Chris Jones at the Plano Police Department concerning the allegation underlying the indictment in this cause.
>
> 2. The interview was video and audio recorded on a device capable of making an accurate recording. The operator of the device was competent, and the recording was accurate and unaltered at the time it was proffered at the hearing.
>
> 3. There are two material voices on the recording, and both are identified: the defendant and Detective Chris Jones.
>
> 4. Detective Jones orally provided the defendant the warnings set forth in

T.C.C.P. Art. 38.22, Sec. 2.

5. Detective Jones provided the defendant with a paper copy of the warnings set forth in T.C.C.P. Art. 38.22, Sec. 2. The defendant initialed each warning and signed the document, certifying that he read and understood the warnings and that he knowingly, intelligently, and voluntarily waived his rights.

6. The defendant knowingly, intelligently, and voluntarily waived the rights set out in the warnings provided to him.

7. The defendant was not handcuffed, and was not under arrest at the time of the interview. Prior to answering Detective Jones' questions, the defendant asked Detective Jones if he was under arrest. Detective Jones responded that the defendant was not under arrest at that time.

8. At the time of the interview, Detective Jones had obtained, and was in possession of, a warrant for the defendant's arrest in connection with the allegation about which the defendant was being interviewed. The defendant was not aware of the warrant at any time during the interview.

9. Based on the objective circumstances, the defendant was not in custody at the time of the interview.

10. Notwithstanding the finding in Paragraph 9 above, the defendant's interview met the requirements for a lawful custodial interrogation.

11. The defendant's statements were made freely and voluntarily without compulsion or persuasion.

12. The defendant's statements are admissible as a matter of law and fact.

We review a trial court's refusal to suppress evidence for an abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). In reviewing the trial court's decision, we view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We afford almost total deference to a trial court's determination of historical facts, but review pure questions of law de novo. *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). Likewise, we give almost total deference to a trial court's resolution of mixed questions of law and fact if those questions turn on the witnesses' credibility and demeanor. *Id*. However, if credibility and demeanor are not necessary to resolve a mixed question of law and fact, we review the question de novo. *Id*. When, as in this case, the

–12–

trial court makes fact findings on a motion to suppress, we must determine whether the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013).

The statement of an accused may be used in evidence against him if it appears it "was freely and voluntarily made without compulsion or persuasion." TEX. CODE CRIM. PROC. ANN. art. 38.21. A statement may be deemed involuntary under several theories: (1) Article 38.22, section 6 (general voluntariness); (2) *Miranda* as expanded in article 38.22, sections 2 and 3 (the Texas confession statute); or (3) the Due Process Clause. *See Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008). Appellant does not specify which of these theories is the basis for his argument on appeal. In his motion to suppress, he alleged that Detective Jones substantially deprived of him of his freedom, that his statements were coerced and enticed, that he did not waive his rights intelligently and knowingly, and that the admission of his statements violated the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Section 9 and 10 of the Texas Constitution,[2] and Articles 1.05 and 38.23 of the Texas Code of Criminal Procedure. Appellant reiterates these complaints in his brief. Because the trial court entered its findings and conclusions in accordance with article 38.22, section 6, of the code of criminal procedure and submitted a jury instruction on the voluntariness of the statement, we will address appellant's complaint as a challenge to the general voluntariness of his statements.

Article 38.22, section 6, applies to both an accused's custodial and non-custodial

---

[2] Appellant does not separately brief his state and federal constitutional claims or argue the Texas Constitution provides greater protection than the United States Constitution in a situation such as this. Accordingly, we address appellant's issue based on the protections provided by the U.S. Constitution. *See Flores v. State*, 319 S.W.3d 697, 702 n.8 (Tex. Crim. App. 2010) (resolving case "under the Fourth Amendment only" when appellant "never argued that Article 1, § 9 [of the Texas Constitution] provides more protection than the Fourth Amendment"); *see also Parker v. State*, Nos. 05-16-00260-CR, 05-16-00260-CR, 2017 WL 2267242, at *1 n.1 (Tex. App.—Dallas May 23, 2017, no pet.) (mem. op., not designed for publication); *Bates v. State*, No. 05-15-00899-CR, 2016 WL 1733464, at *2 n.1 (Tex. App.—Dallas Apr. 28, 2016, no pet.) (mem. op., not designated for publication).

statements because it provides that only "voluntary" statements may be admitted.[3] *Oursbourn*, 259 S.W.3d at 171; *Allen v. State*, 479 S.W.3d 341, 350 (Tex. App.—El Paso 2015, no pet). Claims of involuntariness under article 38.22, section 6, can be predicated on both police overreaching and on the defendant's state of mind. *See Oursbourn,* 259 S.W.3d at 172; *Allen*, 479 S.W.3d at 350. The question to be asked is "[d]oes it appear—as 38.21 requires—that the statement was freely and voluntarily made without compulsion or persuasion?" *Oursbourn*, 259 S.W.3d at 172; *see Allen*, 479 S.W.3d at 350. Conditions caused by illness, medication, mental disability, mental capacity, and intoxication can be considered as factors in determining whether the statement was voluntary. *Oursbourn*, 259 S.W.3d at 172; *Allen*, 479 S.W.3d at 350. Other factors that may render a statement inadmissible include youth, intoxication, mental retardation, and other disabilities. *See Oursbourn*, 259 S.W.3d at 172–73; *Holt v. State*, No. 05-14-00914-CR, 2016 WL 3018793, at *12 (Tex. App.—Dallas Dec. 13, 2016, pet. filed) (mem. op., not designated for publication). The potential "involuntary" scenarios encompassed by article 38.22 are broader in scope than those covered by due process or *Miranda*. *Oursbourn*, 259 S.W.3d at 173; *Holt*, 2016 WL 3018793, at *12. As a general rule, whether a confession was voluntarily rendered must be analyzed by examining the totality of the circumstances. *Arizona v. Fulminante*, 499 U.S. 279, 285–86, (1991); *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007); *Allen*, 479 S.W.3d at 350.

Appellant's argument is that his suppression motion should have been granted because he has an eighth-grade education, English is not his first language, and Detective Jones interviewed him without telling him he had already secured an arrest warrant prior to the interview. Appellant contends that "[a]ny oral statements cannot be made voluntarily and knowingly when

---

[3] At the conclusion of the suppression hearing the trial court stated that appellant was in custody at the time of the interview because a warrant had been signed for appellant's arrest, but the court's written findings indicate appellant was not in custody. Because section 6 of article 38.22 governs admissibility of an accused's custodial and non-custodial statements, we need not address the issue.

the subject doesn't know what is going on and information has been withheld from him." But the Texas Court of Criminal Appeals has noted that factors such as youth, intoxication, mental retardation, or other disabilities are usually not enough, by themselves, to render a statement inadmissible when evaluating the voluntariness of a confession. *See Oursbourn*, 259 S.W.3d at 172–73; *Holt*, 2016 WL 3018793, at \*12. Furthermore, "'[t]he mere fact that appellant is uneducated and illiterate does not mean that he does not understand the nature of the rights he is waiving and cannot voluntarily give a confession.'" *Martinez v. State*, 131 S.W.3d 22, 35 (Tex. App.—San Antonio 2003, no pet.) (quoting *Peacock v. State*, 819 S.W.2d 233, 235 (Tex. App.— Austin 1991, no pet.)). Nor did appellant present any evidence that his eighth-grade education or Spanish-speaking background had any effect on his ability to understand his rights, waive his rights, or voluntarily make a statement.

The record shows that after appellant voluntarily arrived at the CAC, Detective Jones administered the statutory warnings to appellant and attempted to make sure appellant understood them. Both Jones and appellant spoke English and there did not appear to be a communication problem. Appellant told Jones that he could read, and he appeared to read the written warnings. After doing so, he commented, "Yeah, it's pretty much what you've already read to me, right?" Appellant initialed and signed the warnings in the places indicated on the form and agreed to speak with the detective. Appellant then willingly participated in the interview, which lasted approximately forty-five minutes. The record shows no evidence of intimidation or coercion. Indeed, at one point appellant told the detective, "I'm not afraid to talk to you." At no point did appellant request an attorney or ask that the interview be terminated. The record contains no evidence that appellant's will was overborne because of his education level or his Spanish-speaking background. Moreover, there is nothing in this record showing the kind of police behavior that would typically render a statement involuntary. *See Oursbourn*, 259

–15–

S.W.3d at 170-71 (listing various examples of police overreaching).

As for appellant's contention that the detective should have told him he had already secured a warrant for his arrest, appellant does not cite any pertinent authority to support this argument. The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. *See Ripkowski v. State*, 61 S.W.3d 378, 384 n.10 (Tex. Crim. App. 2001) (citing *Colorado v. Spring*, 479 U.S. 564, 573 (1987)); *Canady v. State*, 100 S.W.3d 28, 30 (Tex. App.—Waco 2002, no pet.). It is enough that the suspect knows he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. *Ripkowski*, 61 S.W.3d at 384 n.10. Furthermore, the Supreme Court has "never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's wavier of *Miranda* rights." *See Spring*, 479 U.S. at 576; *see also Murphy v. State*, 100 S.W.3d 317, 322 (Tex. App.—San Antonio 2002, pet. ref'd) ("[I]t is not critical that a suspect know the charges to which he is susceptible.").

Like an officer's silence regarding the subject matter of an interrogation, Detective Jones's silence regarding the arrest warrant did not render appellant's statement involuntary. The warrant's existence was not a required admonishment and appellant offered no evidence or argument as to how it improperly affected his decision to participate in the interview. As the Supreme Court stated in *Colorado v. Spring*, a valid waiver does not require authorities to "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Spring*, 479 U.S. at 577. Therefore, we conclude that an examination of the totality of the circumstances demonstrates the trial court did not abuse its discretion by denying appellant's motion to suppress. We overrule appellant's first issue.

## 2. Sufficiency of the Evidence

In his second issue, appellant argues there is insufficient evidence to support a guilty verdict. In reviewing the sufficiency of the evidence, we consider all evidence in the light most favorable to the jury's verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). It remains the factfinder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Jackson*, 443 U.S. at 319. We do not reevaluate the weight and credibility of the evidence and then substitute our judgment for that of the factfinder. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based on the cumulative force of the evidence when viewed in the light most favorable to the verdict. *See Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011).

To obtain a conviction for aggravated sexual assault of a child, the State had to prove beyond a reasonable doubt that appellant intentionally or knowingly caused A.R.'s sexual organ to contact his mouth and that A.R. was under fourteen years of age. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(iii) & (a)(2)(B). The testimony of a child victim alone is sufficient to support a conviction for aggravated sexual assault. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07; *Revels v. State*, 334 S.W.3d 46, 52 (Tex. App.—Dallas 2008, no pet.); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd). "The victim's description of what happened to her need not be precise, and she is not expected to express herself at the same level of sophistication as an adult." *Gonzalez Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi 2008, no pet.); *see also Hiatt v. State*, 319 S.W.3d 115, 121 (Tex. App.—San Antonio 2010, pet. ref'd) (child victim of sexual abuse is "afforded greater latitude when testifying and [is] not expected to

testify with the same clarity and ability as is expected of a mature and capable adult"). A child victim's testimony is liberally construed and, "as long as the child communicates to the factfinder that the touching occurred on a part of the body within the definition of the statute, the evidence will be sufficient." *Jones v. State*, 428 S.W.3d 163, 169 (Tex. App.—Houston [1st Dist.] 2014, no pet.). "The State has no burden to produce any corroborating or physical evidence." *Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Cantu v. State*, 366 S.W.3d 771, 776 (Tex. App.—Amarillo 2012, no pet.) ("Corroboration of the victim's testimony by medical or physical evidence is not required."); *Hiatt*, 319 S.W.3d at 121–22 ("[P]rosecution is not required to introduce any medical reports or other physical evidence to corroborate a child victim's testimony during trial."). "The lack of physical or forensic evidence is a factor for the jury to consider in weighing the evidence." *Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *affirmed*, 206 S.W.3d 620 (Tex. Crim. App. 2006).

Appellant argues the evidence is "factually insufficient" because A.R.'s statements were uncorroborated; there was testimony that A.R. was unreliable; A.R. was an unwilling witness; and the jury sent out a note regarding its disagreement about two instances of A.R.'s testimony. Appellant also contends a neutral review of the facts is needed to assess whether the State proved its case beyond a reasonable doubt. Because the factual sufficiency standard was eliminated in *Brooks v. State*, *see* 323 S.W.3d at 895, we apply the *Jackson v. Virginia* standard to appellant's sufficiency claim. *See Lucio v. State*, 351 S.W.3d 878, 895 (Tex. Crim. App. 2011) ("We do not review the factual sufficiency of the evidence to support a jury's finding on the elements of a criminal offense that the State is required to prove beyond a reasonable doubt.").

A.R. testified appellant touched her inappropriately when she was eleven years old. When pressed for details, she repeatedly said that she either did not remember or did not know.

Even so, however, she agreed that Dr. Reeder's medical note—which stated: "[F]all or Winter 2012, [appellant] placed his mouth on [A.R.'s] vagina over clothing"—was true. She also agreed with the prosecutor that appellant put his mouth on her vagina over her clothes and that it felt wrong. *See IslasMartinez v. State*, 452 S.W.3d 874, 877–81 (Tex. App.—Dallas 2014, pet. ref'd) (aggravated sexual assault of a child does not require proof that sexual contact was "flesh-to-flesh" but instead includes sexual contact through clothing). When the prosecutor asked if there was any doubt in her mind about it, A.R. replied, "No." To the extent A.R.'s testimony was inconsistent and/or vague regarding the details surrounding the offense, this concerned her credibility as a witness, which was a matter for the jury in its role as the sole judge of the weight and credibility of the evidence. *See Revels*, 334 S.W.3d at 53. The same goes for Yolanda's testimony that she did not believe her daughter's testimony. In the end, it was up to the jury to accept some, all, or none of this testimony, and we must presume the jurors resolved the conflicts in the evidence in favor of the verdict. Appellant also points out that the jury sent out a note regarding its disagreements about A.R.'s testimony, but this does not bear on the sufficiency of the evidence. *See Perry v. State*, No. 01-09-01136-CR, 2011 WL 286132, at *13 (Tex. App.—Houston [1st Dist.] Jan. 27, 2011, no pet.) (not designated for publication) ("[Appellant] cites no authority, and we have found none, that holds that we may weigh the contents of jury communications as part of our review of the sufficiency of the evidence."). Additionally, the jury could have reasonably considered appellant's statements during the interview as indicative of guilt.

Deferring to the jury's determination of the credibility of the witnesses and the weight to be given their testimony, based on the cumulative force of all the evidence when viewed in the light most favorable to the verdict, and considering the reasonable inferences to be drawn from that evidence, we conclude a rational trier of fact could have found the essential elements of the

offense beyond a reasonable doubt. Appellant's second issue is overruled.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. 47
160576F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DELMAR ALFREDO FLORES, Appellant

No. 05-16-00576-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 380th Judicial District Court, Collin County, Texas
Trial Court Cause No. 380-82105-2013.
Opinion delivered by Justice Myers. Justices Lang and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 18th day of July, 2017.