COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| JOSE MANUEL BRITO, | § | |
| Appellant, | § | No. 08-15-00196-CR |
| | § | Appeal from the |
| V. | § | |
| | § | 384th District Court |
| THE STATE OF TEXAS, | § | |
| | § | of El Paso County, Texas |
| Appellee. | § | |
| | § | (TC# 20140D05269) |

## **O P I N I O N**

Appellant, Jose Manuel Brito, in four issues, appeals his conviction for recklessly causing serious bodily injury to a child.   First, Appellant challenges the trial court's admission of evidence of rib fractures that he alleges are inadmissible, not relevant, and prejudicial which prevented him from receiving a fair trial, thus, requiring reversal.   Second, Appellant maintains the trial court erred in denying his motion to quash the indictment coupled with a flawed jury charge and the erroneous admission of the evidence of rib fractures, collectively, allowed the jury to reach a non-unanimous verdict as to which injuries supported his conviction.

Third, he argues the trial court erred in allowing the child/victim to be viewed by the jury in the State's case-in-chief and denying his motion for mistrial after the child/victim was brought into the courtroom during Appellant's closing argument in the punishment phase, because he

asserts the physical presence of the child was extremely prejudicial and deprived him of a fair trial. Last, Appellant asserts the trial court abused its discretion in admitting Appellant's video-recorded statements after he had "invoked his *Miranda* rights." We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Alicia Velazquez and Appellant are the parents of a son, R.B., born July 6, 2011. On September 30, 2011, during a medical check-up, like each one of his prior check-ups, R.B. was found to be a healthy normal baby. However, at three months' old, on October 18, 2011, R.B., was admitted to the hospital in critical condition, because he was not breathing and had no pulse.

Appellant took care of R.B. while Alicia worked. On October 17, Appellant and R.B. were home alone when Appellant called Alicia at work telling her that the baby was having trouble breathing and choking on his milk. Alicia left work early and found R.B. doing well. The following day, when Alicia left for work, R.B. looked normal. Again, Appellant called Alicia at work, stating R.B. was choking and having trouble breathing. She told him to call 911. According to Appellant, he began performing CPR on R.B., saving his son's life, until the paramedics arrived.

Upon arrival of the emergency room, R.B. was breathing with the assistance of a paramedic, without a pulse, not breathing and possibly dead. R.B. was intubated, his chest was x-rayed, and a CT scan performed. The x-ray revealed multiple rib fractures with calluses indicating the rib fractures were three weeks' old and suggested child abuse. The CT scan showed subdural hematoma, which is bleeding on the brain. The doctors concluded that R.B.'s medical condition was due to child abuse not choking.

*Video-Recorded Statement*

2

On October 18, 2011, the same day R.B. was admitted to the hospital, El Paso Police Department Detectives Gonzalez and Alvarado met with Appellant at the hospital. They spoke with Appellant alone to ask him what had happened with R.B., given that Appellant and his three-month-old son were home alone when paramedics arrived. Appellant was not arrested and returned to his wife sitting outside in the hospital hallway.

The next day the Detectives encountered Appellant and his wife at the hospital for the second time. They approached Appellant and explained they needed a statement from him. Appellant consented. At the hospital, the Detectives informed Appellant that he was free to leave at any point, however he needed to accompany them to the police station to make his statement, and once the statement was made, Detectives would give him and his wife a ride back to the hospital. The detectives transported Appellant and his wife to the police station because their car had broken down. Appellant was not placed under arrest or hand-cuffed and voluntarily went to the police station with the Detectives to provide a statement.

At the police station, the Detectives first interviewed Alicia, while Appellant waited outside the interview room in a waiting area by himself. Once the interview of Alicia was concluded, the Detectives met with Appellant. Detectives Gonzalez and Alvarado began taping Appellant's statement before he sat down in the interview room. In the video, after Appellant is seated, both Detectives introduce themselves again. Next, Detective Gonzalez explains to Appellant "You are not under arrest, you are free to leave at any time." Further, he instructs Appellant, "You can stop this interview at any time." Detective Gonzalez tells Appellant if he needs water or to use the restroom, to let Detective Gonzalez know. Further, Detective Gonzalez informs Appellant that once his statement is completed, the detectives will transport him and his wife back home.

3

Appellant is not handcuffed, appears to be seated comfortably in a chair and vigorously nods his head assenting to what Detective Gonzalez is telling him indicating Appellant is in agreement and responding "Yes, sir."  Next, Detective Gonzalez tells Appellant "under no obligation are you here" to which Appellant replies "I understand."

At this point, Detective Gonzalez requested Appellant read the *Miranda* card warnings, because it is their policy he do so.  Gonzalez instructs Appellant to read the *Miranda* card out-loud in either Spanish or English whichever language he is more comfortable in.  Appellant, haltingly in English reads the complete *Miranda* warnings to the Detectives.  Gonzalez asks him if he understands what he has read, Appellant responds, "yes, so I'm waiving my rights reading this?"  Gonzalez replies that is "something we need to advise you of."  Appellant states "I'll tell you what happened, but I'm not waiving my rights . . . I already did the interview with you, but this?"  The detectives attempt to explain this is the policy that they need to follow in order to speak with Appellant.  Appellant said, "But I'm waiving my rights, this is not good."  Appellant asserts that he has already spoken with the Detectives.  The Detectives explain that the previous interview was an informal one and this is their formal interview with him.  Gonzalez tells Appellant that they are just going to go over with Appellant what they had already discussed in their informal interview the day before.  Appellant assents by stating "Ok, but no more further than that, right?  Because I want my rights."  Gonzalez says "Yes."  Appellant replies "Alright, that's fine" nodding his head yes.  Gonzalez asks Appellant if he understood everything he read, Appellant responds "Yes, sir."  Gonzalez then turns to what had been discussed with Appellant in the prior interview.

Appellant explained that he was feeding R.B. his bottle when the baby started choking. He called 911 and began administering CPR. In the panic of performing CPR on the baby, Appellant admitted he accidently bumped R.B.'s head on the arm of the couch.

After Appellant completed his statement, Detective Gonzalez informed Appellant that R.B. has two skull fractures with head trauma, nine broken ribs in different stages of healing, and the baby is fighting for his life unable to breathe on his own. Detective Gonzalez further explains that the baby's injuries are not the result of choking or a bump on the head, stating "It is a severe, severe fracture." Gonzalez asks Appellant "Now, what do you have to say?" Appellant replies "That's messed up. . . . I don't know." Gonzalez explains that the baby's injuries are "inflicted trauma" and "somebody did it." Gonzalez states that it has to be either Appellant or Alicia, and Alicia has vehemently denied she did anything to the baby. Appellant sarcastically tells Gonzalez "It's me of course . . . that's crazy." Appellant finally tells Gonzalez, "This is going to end here, because you are trying to push it on me." Appellant then stood up and walked out of the interview room.

*At Trial*

In November 2014, Appellant was indicted on four counts of injury to a child. Count I alleged Appellant intentionally and knowingly caused serious bodily injury to R.B. Count I included five alternate paragraphs detailing the manner and means injury to a child could have been committed. Paragraph A alleged injury to a child occurred by striking R.B.'s head with an unknown object; Paragraph B alleged it occurred by striking R.B.'s head against an unknown object; Paragraph C alleged by then and there shaking R.B.'s body; Paragraph D alleged by striking R.B.'s head with an unknown object and shaking R. B.'s body; and Paragraph E alleged by striking

5

R.B.'s head against an unknown object and shaking R.B.s body.

Count II alleged Appellant intentionally and knowingly caused bodily injury to R.B.'s finger. Count III alleged Appellant intentionally and knowingly caused bodily injury to R.B.'s leg. The trial court granted Appellant's motion to sever Court IV which alleged Appellant caused bodily injury by squeezing R.B. with Appellant's hands.

During the State's case-in-chief, the State requested the trial court allow R.B. to be present during the testimony of his caregiver and grandmother, Carmen Velasquez. R.B. at the time of trial was wheelchair bound and severely disabled. The State argued that the sight of R.B. and his physical conditions were relevant in proving the serious bodily element of the indictment. Appellant objected that the jury's viewing of R.B. in the courtroom was more prejudicial than probative, inflammatory, cumulative and an effort to manipulate juror's sympathies. The trial judge overruled the objection and allowed the State to bring R.B. into the courtroom, introduce him to the jury, and then take him back out.

Velasquez began to testify while R.B. was present in the courtroom. R.B. started crying and was removed. Velasquez testified R.B. was her grandson, soon to be four years' old, that had just left the courtroom. Velasquez stated that R.B. suffers from seizures, is blind, unable to speak or walk, wears diapers, and is fed through a feeding tube. Further, R.B. requires twenty-four-hour care.

As Appellant concluded his closing argument for punishment and the State began to address the jury, R.B. was brought back into the courtroom. The State argued that R.B. had a constitutional right to be present in the courtroom, however, the trial court was unpersuaded stating "Your timing is perfect; and I'm very offended by it." R.B. began to moan, at which point the

6

prosecutor offered to have R.B. taken out of the courtroom.   The trial judge ordered the prosecutor and defense counsel into chambers.   After the trial court's recess, outside the presence of the jury, on the record Appellant's counsel stated that he had not noticed R.B.'s presence in the courtroom, was moving for a mistrial because the jury had been "inflamed and prejudiced[.]"

The trial court denied Appellant's motion for mistrial, told the State that the trial court was insulted by the State's timing and opined that R.B. should have been brought in before closing arguments had begun.   Appellant did not request a curative instruction after the denial of the motion for mistrial.

The jury found Appellant guilty of a lesser included of recklessly causing serious bodily injury under Count I and acquitted him of Counts II and III.   Prior to trial, the State filed a notice of enhancement of Appellant's prior conviction of injury to a child, in which he was sentenced to two years' in the Institutional Division of the Texas Department of Criminal Justice.   The jury found the State's enhancement allegation true and assessed sentence of 75 years' confinement and a $7,500.00 fine.   Count IV was dismissed.   This appeal followed.

**ISSUES**

First, Appellant asserts the trial court abused its discretion when the evidence of the rib fractures is an extraneous offense and was erroneously admitted causing unfair prejudice depriving him of his right to a fair trial, a violation of Rules 403 and 404(b) of the Texas Rules of Evidence.[1] In addition, Appellant objects to the evidence of the rib fractures because he asserts they are irrelevant, remote, and of unknown origin, a violation of TEX.R.EVID. 402.   Appellant argues that even if the evidence of rib fractures is relevant, they are not admissible as same-transaction

---

[1] Appellant also notes that he never received notice pursuant to TEX.CODE CRIM.PROC.ANN. art. 38.37 (West 2018) or TEX.R.EVID. 404(b) regarding the rib fractures.

contextual evidence. Appellant insists the evidence was so unfairly prejudicial that his substantial rights were affected and to such a degree that he is entitled to a new trial.

Second, Appellant argues the flawed indictments accompanied by a deficient jury charge permitted the jury to convict Appellant on the inadmissible rib fractures evidence, and demands a reversal. Appellant takes special issue with paragraph C of Count I which alleges the injury to a child was committed by shaking R.B.'s body, which he contends allowed the jury to reach a non-unanimous verdict. Appellant's position is that some members of the jury may have convicted based on the rib fractures to support paragraph C while other jurors could have convicted Appellant for causing the skull fractures under paragraphs A and/or B. Appellant argues that such a verdict is unlawful. Thus, Appellant concludes he was convicted of an offense that he was not being tried for, that is, the rib fractures which he asserts are inadmissible. Appellant reinforces this argument by contending the trial court erred in refusing to quash the indictment. Appellant argues that the five different manners and means of committing injury to a child subjected Appellant to non-unanimous verdict and therefore, we must reverse. In the alternative, Appellant argues a reversal is mandated because the jury charge permitted a non-unanimous verdict. Appellant acknowledges no objection to the jury charge was made, so the reviewing court must find egregious harm in order to reverse. Appellant asserts his deprivation of his right to unanimous verdict was violated, ergo, egregious harm that merits a new trial.

Third, the trial court abused its discretion in allowing R.B.'s physical presence in the courtroom during the State's case-in-chief constituted an "inflammatory evidence[.]" Further, Appellant alleges the trial court erred in overruling his motion for mistrial after R.B. was found present in the courtroom as Appellant concluded his closing punishment argument. Fourth, the

8

trial court violated Appellant's rights when it admitted his video-recorded statement after he alleges his *Miranda* rights had been invoked.

The State's response to Appellant's first issue is the evidence of R.B.'s rib fractures is same-transaction contextual evidence. Further, the State argues that Appellant opened the door by arguing in opening statement that R.B.'s skull fractures were accidental. In addition, according to the State, the rib fractures were (1) relevant to show how R.B.'s skull fractures were inflicted; (2) properly admitted under Rule 404(b) to show intent, absence of accident and rebut defense theory; (3) not unfairly prejudicial; and (4) admissible to show Appellant's state of mind and relationship to R.B. Even if the admission of the rib fractures is error, the State contends the Appellant suffered no harm and did not receive an unfair trial.

The State contends Appellant's second issue is wholly without merit as a valid verdict does not require juror unanimity as to manner and means of committing a single offense. According to the State, the medical evidence supporting paragraph C was elicited for the sole purpose of explaining R.B.'s head fractures.

To Appellant's third issue, the State answers the visual evidence of a victim's injuries is admissible to assess, specifically in child injury cases, the extent to which the child has or has not suffered from serious bodily injury. The State, further, asserts that Appellant fails to point out the harm in having the jury observe R.B. the second time in the courtroom during Appellant's closing remarks to the jury in the punishment phase. The State maintains the trial court did not abuse its discretion in overruling Appellant's motion for mistrial.

Lastly, the State counters that Appellant's video-recorded statement was taken when Appellant was not in custody.

9

# DISCUSSION

## 1. *Admission of evidence of R.B.'s Rib Fractures*

### *Standard of Review*

When reviewing a trial court's ruling on the admission of evidence, appellate courts use an abuse-of-discretion standard of review. *Davis v. State,* 329 S.W.3d 798, 803 (Tex.Crim.App. 2010). Under that standard, a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside the zone of reasonable disagreement or is arbitrary or unreasonable. *Lopez v. State,* 86 S.W.3d 228, 230 (Tex.Crim.App. 2002); *State v. Mechler,* 153 S.W.3d 435, 439 (Tex.Crim.App. 2005). Moreover, the ruling will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct under any theory of law applicable to the case." *Carrasco v. State,* 154 S.W.3d 127, 129 (Tex.Crim.App. 2005).

Relevant evidence is generally admissible. TEX.R.EVID. 402; *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990)(opin. on reh'g). Relevant evidence is any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. TEX.R.EVID. 401.

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. TEX.R.EVID. 403. In *Montgomery*, the court held that a proper Rule 403 analysis by either the trial court or a reviewing court includes, but is not limited to, the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. 810 S.W.2d at 389-90; *see also Erazo v. State*, 144 S.W.3d 487, 489 (Tex.Crim.App. 2004).

The evidence introduced against a defendant, if relevant to an issue at trial, may show proof of guilt, but that does not make it necessarily prejudicial in the context of the rules of evidence. *Montgomery*, 810 S.W.2d at 378, *citing United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Evidence is prejudicial only when it has some adverse effect upon a defendant beyond proving a fact or issue that allowed its admission. *Id.* The prejudicial effect may be the result of the evidence to prove an adverse fact not properly in issue or unfairly inflame emotions against the defendant. *Id.*

We review the admission of extraneous offense evidence under Rule 404(b) for an abuse of discretion. *De La Paz v. State,* 279 S.W.3d 336, 343 (Tex.Crim.App. 2009); *Prible v. State,* 175 S.W.3d 724, 731 (Tex.Crim.App. 2005); TEX.R.EVID. 404(b). A trial court's determination on the admissibility of extraneous-offense evidence typically falls within the zone of reasonable disagreement if the evidence shows: (1) that an extraneous transaction is relevant to a material, non-propensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *De La Paz,* 279 S.W.3d at 344. This standard applies to both Rules 404(b) and 403 rulings. *Montgomery,* 810 S.W.2d at 391. Appeals courts uphold the decisions of trial courts if any legal basis exists for doing so, even where the trial court expressly relied on an incorrect basis. *State v. Ross,* 32 S.W.3d 853, 856 (Tex.Crim.App. 2000). The trial court's ruling must be upheld if it is reasonably supported by the record and correct under any applicable theory of the law. *See Willover v. State,* 70 S.W.3d 841, 845 (Tex.Crim.App. 2002).

Under Texas Rules of Evidence 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove that the accused committed the charged offense in conformity with his bad

11

character. TEX.R.EVID. 404(b). However, it may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.*; *Devoe v. State,* 354 S.W.3d 457, 469 (Tex.Crim.App. 2011); *Montgomery,* 810 S.W.2d at 387. These exceptions are neither mutually exclusive nor collectively exhaustive. *De La Paz,* 279 S.W.3d at 343. For example, "under the reasoning that events do not occur in a vacuum[,]" evidence of extraneous offenses may be admissible "[t]o show the context in which the criminal act occurred[.]" *Albrecht v. State,* 486 S.W.2d 97, 100 (Tex.Crim.App. 1972); *see also Devoe,* 354 S.W.3d at 469 (discussing admissibility of same-transaction contextual evidence).

The jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. *Devoe,* 354 S.W.3d at 469. In order for an extraneous offense to be admissible, it must be relevant apart from supporting an inference of character conformity. *See Montgomery,* 810 S.W.2d at 387; TEX.R.EVID. 401. There are two types of contextual evidence: (1) evidence of other offenses connected with the primary offense, referred to as same transaction contextual evidence; and (2) general background evidence, referred to as background contextual evidence. *Mayes v. State,* 816 S.W.2d 79, 86–87 (Tex.Crim.App. 1991). Same transaction contextual evidence is admissible as an exception under Rule 404(b) where such evidence is necessary to the jury's understanding of the charged offense. *See Wyatt v. State,* 23 S.W.3d 18, 25 (Tex.Crim.App. 2000); *Rogers v. State,* 853 S.W.2d 29, 33 (Tex.Crim.App. 1993). Extraneous conduct is considered to be same transaction contextual evidence when the charged offense would make little or no sense without also bringing in the same transaction evidence. *Rogers,* 853 S.W.2d at 33. Such evidence provides the jury information essential to understanding the context and circumstances of events that are blended or interwoven. *Camacho v. State,* 864 S.W.2d 524, 532

12

(Tex.Crim.App. 1993).

The function of admitting same transaction contextual evidence is not to show that the extraneous charged offenses are part of the same scheme or committed in the exact same manner. *Jones v. State,* 962 S.W.2d 158, 166 (Tex.App.--Fort Worth 1998, no pet.). Nor can it be used to illustrate that appellant committed the charged offense because he may have also committed the extraneous offense. *Id.* "[S]ame-transaction contextual evidence is admissible only when the offense would make little or no sense without also bringing in that evidence[.]" *Devoe,* 354 S.W.3d at 469.

To be admissible, extraneous offense evidence must satisfy the requirements of same transaction contextual evidence and the balancing test of Rule 403. TEX.R.EVID. 403. A trial court must still perform a balancing test to see if the same transaction contextual evidence's probative value is substantially outweighed by its prejudicial effect. *Houston v. State,* 832 S.W.2d 180, 183–84 (Tex.App.--Waco 1992, pet. dism'd); *Smith v. State,* 949 S.W.2d 333, 337 (Tex.App.--Tyler 1996, pet. ref'd). The prejudicial nature of contextual evidence rarely finds such evidence inadmissible, so long as it properly places the extraneous offense in context to aid in the jury's comprehension of the case at hand. *Id.*

*Rib Fracture Testimony*

Prior to opening statements in the guilt stage of the trial, the State requested the trial court permit R.B.'s doctors to testify regarding the baby's rib fractures. Appellant responded that they were inadmissible because they were too remote, an extraneous offense, not sufficiently linked to Appellant and more prejudicial than probative. The court overruled those objections.

Appellant's opening argument laid out the defense theory that the evidence is

13

"inconclusive" as to when or how R.B.'s injuries occurred and who caused them. Defense counsel posited that R.B. may have been born with subdural hematoma; developed the brain injury from birth trauma; and the finger and leg fracture may have happened in the hospital by accident.

Dr. Scott Greene, the attending emergency physician, testified the call from the ambulance was R.B. was not breathing, had no pulse, receiving CPR and "was possibly dead." R.B. was categorized as a serious medical case as opposed to a trauma case. However, upon arrival to the hospital R.B. had a pulse and a paramedic was breathing for R.B. with a bag valve mask. Because R.B. was not breathing on his own, Dr. Greene immediately intubated the baby. R.B.'s pupils were dilated and not responding. In addition, R.B.'s soft spot on his head was bulging and firm.

As soon as R.B. was intubated, a chest x-ray was performed along with a CT scan of his head. The chest x-ray showed multiple rib fractures. Based on these rib fractures, Dr. Greene stated the case immediately became a child abuse case not a "child choking" case. Dr. Greene observed the rib fractures were healing and opined that they would have been at least five days old. Thus, the category of R.B.'s case changed from a "medical" case to a "trauma" case. Dr. Greene notified the pediatric intensive care doctor and trauma surgeons for R.B.'s admission. The most critical person that R.B. needed was a neurosurgeon. If the paramedics had known this was a trauma case, according to Dr. Greene, the trauma surgeons would have been in the emergency room upon R.B.'s arrival.

Dr. Chetan Moorthy, a pediatric radiologist, read R.B.'s first CT scan performed on October 18. Dr. Moorthy, based on his reading of the CT scans, opined that R.B.'s head "hit something that caused the fracture and the skull to swell. That same injury caused the bleeding

14

around the brain. When a child's head hits something this hard, frequently they will stop breathing. And once they stop breathing, there's not enough oxygen to the brain, and so the deeper part of the brain starts to swell." Dr. Moorthy stated that "in babies . . . there are little veins that connect the brain and go out towards the skull. And if you shake a baby's head violently enough . . . the brain moves at a different speed as the vein, and that shearing force can tear those veins. And the bleeding in that case occurs in the same compartment – the subdural compartment – where we're seeing with the head here. So yes, shaking the child violently could cause bleeding in the subdural space."

Dr. Moorthy explained "[I]n this case we have clear evidence of impact. Impact simply means the head either hit something or something hit the head. That caused the fracture and that caused the swelling of the scalp. That's not really disputable. That's self-evident. The bleeding in the space around the brain could be caused by the impact, but it could have been preceded by a violent shaking and then an impact. So the sequence that we see a lot of times -- and in this child, we have other evidence that supports this[.]" According to Dr. Moorthy, "the sequence we see in abuse of infants in this age is an initial grabbing of a child by the chest -- that causes certain injuries to the rib cage, which we see in this child -- followed by a violent shaking and then a slam or a throw. R.B.'s lining around the brain had been torn which could have been the result of an earlier brain injury. Dr. Moorthy asserted that R.B. was at high risk of dying and his brain injuries constituted serious bodily injury.

Initial x-rays of R.B.'s body revealed the skull fracture and multiple fractures of ribs on both sides. Dr. Moorthy noted that many of the rib fractures were healing and had occurred "a week or two to three weeks" prior. The x-rays showed six different healing rib fractures on both

15

sides of R.B.'s chest that were forming callus where the bone was healing. Dr. Moorthy stated that when a baby is being assaulted, the perpetrator will grab the infant's chest with both hands squeezing "the chest with a violent force, and ribs crack where the hands are on both sides." Dr. Moorthy maintained that "this fracture could not have been accidental. We know this fracture was inflicted by someone else." Dr. Moorthy asserted that "multiple rib fractures in a three-month-old are inflicted. They don't occur accidentally. They don't occur with CPR. They just don't. You don't get multiple bilateral fractures on the side of the chest from CPR."

In the bone survey of R.B., two fractures were found in R.B.'s right leg and another on his right second finger. Dr. Moorthy found one of the leg fractures was not sustained accidently, but rather it is a "twisting and rotational injury." The second leg fracture was the result of a direct blow.

*Analysis of the Admissibility of Evidence of Rib Fractures*

R.B.'s fracture and brain injury could have been the result of both a violent shaking and the impact of a hard surface upon the baby's head. Based on the neurologist's report finding of hygroma or old blood in the front of the brain, Dr. Moorthy stated that was evidence of more than one episode of injury. According to Dr. Moorthy the torn brain lining could have resulted from a previous brain injury involving a violent shaking which in turn explains the six healing rib fractures. The rib fractures may have occurred anywhere from five days to three weeks prior to R.B.'s admission to the hospital. More importantly, the evidence of the rib fractures assists the jury to understand how R.B. may have sustained previous brain injuries which is supported by the presence of the old blood found in R.B.'s head. Thus, in order for the jury to understand the extent and the context of R.B.'s brain injuries and skull fracture, the evidence of rib fractures were

16

inextricably intertwined with how R.B.'s brain injuries developed.

Additionally, Dr. Greene testified that once he observed the rib fractures, the case took a decidedly different turn, medically. The discovery of the rib fractures necessitated a trauma approach involving a neurosurgeon and pediatric intensive care physician. The rib fractures accounts to the jury how the case morphed from a child choking incident to child abuse which prompted the opening of an investigation.

The six rib fractures are relevant to understand how and why a criminal investigation was undertaken and explains Dr. Greene's decisions regarding which doctors were required for R.B.'s treatment. The testimony of the rib fractures is also particularly crucial in comprehending how R.B. sustained his brain injuries and skull fracture. This evidence is especially pertinent, when in Dr. Moorthy's view, the rib fractures and the head injuries were likely perpetrated at the same time and no longer than three weeks prior to R.B.'s admission. The evidence regarding the healing rib fractures with the prior brain injury makes it more probable that R.B.'s injuries were intentional and not accidental. For evidence to be relevant, it is critical that there be a direct or logical connection between the actual evidence and proposition sought to be proved. *Layton v. State*, 280 S.W.3d 235, 240 (Tex.Crim.App. 2009). We find the evidence is relevant, admissible, and not outside the reasonable zone of disagreement under Rules 401 and 402.

Second, under Rule 403, while evidence may be relevant, the probative value must outweigh the danger of unfair prejudice. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex.Crim.App. 2007); *see also* TEX.R.EVID. 403. We "must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the

evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted." *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex.Crim.App. 2006).

The probative value of the healing rib fracture evidence was substantial to show how the brain injuries were perpetrated. The evidence of these additional fractures were not so prejudicial or inflammatory especially against the backdrop of R.B.'s two leg fractures, a finger fracture, and his severe head injuries. The healing rib fracture evidence rebutted the defense's theory that the head injuries were accidental, the result of brain trauma or were completely unrelated. The evidence did not suggest the jury would decide this case on an improper basis nor confuse or distract the jurors from the main issue. The evidence of the rib fractures did not indicate it would be given undue weight as shown by the jury's finding of not guilty of the leg and finger fractures. The testimony regarding the rib fractures did not take an undue amount of time nor was it cumulative.

The party objecting under Rule 403 has the burden to show that the probative value is substantially outweighed by the danger of unfair prejudice. *Runnels v. State,* 193 S.W.3d 105, 107 (Tex.App.--Houston [1st Dist.] 2006, no pet.). A trial court is entitled to broad discretion in ruling on a Rule 403 objection, and great deference is given to the trial court's decision to admit or exclude evidence under Rule 403. *See Powell v. State,* 189 S.W.3d 285, 288 (Tex.Crim.App. 2006). We conclude that any prejudicial effect of the rib fracture evidence did not substantially outweigh its probative value.

18

Under Texas Rules of Evidence 404(b), evidence of extraneous offenses is not admissible at the guilt-innocence phase of trial to prove that a defendant committed the charged offense in conformity with a bad character. TEX.R.EVID. 404(b). Evidence of another crime may be admissible as "same-transaction contextual evidence," as when different crimes are intermixed in such a way that full proof by testimony of any one of them cannot be given without revealing the others. *Devoe,* 354 S.W.3d at 469. The jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. *Id.* Only if the facts and circumstances of the charged offense would make little or no sense without also bringing in the same-transaction contextual evidence should such evidence be admitted. *Id.* The necessity of this narration is another purpose "apart from character conformity" for which same-transaction contextual evidence is admissible under Rule 404(b). *Id.*

Last, we turn to the same-transaction contextual evidence which is offered to aid a jury in understanding the charged offense and how it occurred; however, the probative value cannot be outweighed by unfair prejudice nor is it offered to prove character conformity. In this instance, the rib fractures testimony was intrinsically woven into understanding how R.B. received the head injuries. Not only were they necessary to reasonably comprehend R.B.'s medical condition, but also as to how Dr. Moorthy reached his conclusions that R.B.'s fractures collectively were the result of child abuse as opposed to an accident or naturally occurring. They were also necessary for the jury to understand how the investigation into R.B.'s injuries came about. *Cf. Greene v. State,* 287 S.W.3d 277, 283 (Tex.App.--Eastland 2009, pet. ref'd)(holding extraneous offense evidence that explained why defendant was under investigation at time police discovered evidence

19

for crime charged was admissible as same transaction contextual evidence); *Victor v. State,* 995 S.W.2d 216, 223–24 (Tex.App.--Houston [14th Dist.] 1999, pet. ref'd)(same).

The State was entitled to rebut Appellant's counsel's defensive theory that R.B.'s injuries were accidental, the result of CPR, result of birth trauma, and were inconclusive regarding when or how the baby had been injured. The physicians' testimony of the rib fractures, therefore, was admissible as rebuttal evidence. *See Bass v. State,* 270 S.W.3d 557, 562–63 (Tex.Crim.App. 2008)(holding extraneous offense evidence was admissible to rebut defensive fabrication theory); *Wheeler v. State,* 67 S.W.3d 879, 887–89 & n.22 (Tex.Crim.App. 2002)(holding extraneous offense evidence was admissible to rebut defensive theories, including that defendant was framed for charged offense and lack of opportunity). It is at least within the realm of reasonable disagreement that evidence indicating R.B. also sustained rib fractures caused by child abuse was relevant to rebutting the defensive theory and therefore admissible. We hold that the evidence of R.B.'s rib fractures constituted contextual evidence indivisibly connected to the charged offense and was therefore admissible.

We overrule Appellant's first issue.

## 2. *Unanimity of Jury Charge*

### *Standard of Review*

When considering whether there is reversible error in the jury charge, we first decide whether error exists, and if error exists, we determine whether the defendant was harmed. *Middleton v. State,* 125 S.W.3d 450, 453 (Tex.Crim.App. 2003); *Abdnor v. State,* 871 S.W.2d 726, 731–32 (Tex.Crim.App. 1994). Charge error to which the defendant did not object is not harmful and does not require reversal unless the error is so egregious that the defendant is denied a fair and

20

impartial trial. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). The degree of harm must be evaluated in light of the entire record. *Id.* Under the egregious harm standard, alleged charge error is reviewed by considering (1) the entirety of the charge itself, (2) the evidence, (3) the arguments of counsel, and (4) other relevant information revealed by the record. *See Sanchez v. State,* 209 S.W.3d 117, 121 (Tex.Crim.App. 2006); *Almanza,* 686 S.W.2d at 171.

Here, Appellant concedes that he did not object to the jury charge, and thus, if the charge is erroneous, we must apply the egregious harm standard. *Almanza* 686 S.W.2d at 171. Appellant did not request a unanimity instruction. The jury charge addressed the issue in the following way:

> After you have retired to your jury room, you should select one of your members as your presiding juror. It is his/her duty to preside at your deliberations, vote with you, and *when you have unanimously agreed upon a verdict*, to certify your verdict by signing the same as presiding juror. [Emphasis added].

The jury was also instructed that:

> You are further instructed that if there is *any evidence before you* in this case regarding *the defendant's having engaged in conduct or acts other than the offense alleged against him* in the indictment in this case, *you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant engaged in such conduct or acts, if any,* and even then *you may only consider the same in determining the intent or plan of the defendant, if any, in connection with the offense*, if any, alleged against him in the indictment and *for no other purpose*. [Emphasis added].

The Texas Constitution and the Code of Criminal Procedure require a unanimous jury verdict in all felony cases. TEX.CONST. art. V, § 13; TEX.CODE CRIM.PROC.ANN. art. 36.29 (West Supp. 2017). Unanimity requires that every juror agree that the defendant committed the same specific criminal act. *Ngo v. State,* 175 S.W.3d 738, 745 (Tex.Crim.App. 2005). The jurors need not, however, agree on the particular manner and means by which the defendant committed the

21

criminal act.  *Young v. State,* 341 S.W.3d 417, 422 (Tex.Crim.App. 2011).  "'[M]anner or means' describes *how* the defendant committed the specific statutory criminal act."  [Emphasis in orig.]. *Ngo,* 175 S.W.3d at 745.

Injury to a child is a "result of conduct" crime.  *Stuhler v. State,* 218 S.W.3d 706, 718 (Tex.Crim.App. 2007).  The offense of injury to a child is defined in terms of the injury itself, not the conduct that caused it.  *Id.*  Thus, injury to a child, a "result of conduct" offense, is defined by the result of a defendant's conduct, not the manner or means of committing the injury.  *Stuhler,* 218 S.W.3d at 718.  The *Stuhler* court held different types of injuries were "elemental" and jury unanimity is required as to each type of injury alleged.  218 S.W.3d at 718-19.  In Count I, the gravamen of the charged offense is that R.B. suffered serious bodily injury, severe head trauma caused by Appellant.  The indictment alleged that R.B.'s skull fracture was caused by five alternate methods of commission.  Alleging these five different alternative methods of commission, resulting in R.B.'s serious bodily injury, are alternative means, not different crimes. *Id.*

In *Jefferson v. State,* the Court, under similar facts, held that a unanimity instruction was not required.  *Jefferson v. State*, 189 S.W.3d 305, 312-14 (Tex.Crim.App. 2006).  The defendant in *Jefferson* was accused of striking his daughter, causing her to fall and suffer a fatal head injury. *Id.* at 306–07.  The State charged the defendant with injury to a child.  *Id.* at 306.  The indictment alleged alternate methods or means which included an act of commission and an act of omission. *Id.* at 307.  Jefferson contended on appeal that the trial court should have given a unanimity instruction.  *Id.* at 309–10.  The Court of Criminal Appeals rejected this argument.  *Id.* at 306. The Court premised its analysis on whether, per the language of the statute, causing injury by act

22

or by omission were distinct elements or simply different means by which the same offense could be committed. *Id.* at 312, (citing *Richardson v. United States,* 526 U.S. 813, 817-18, 119 S.Ct. 1707, 1710, 143 L.Ed.2d 985 (1999)). The Court noted the language of the statute criminalized any "act or omission" that caused bodily injury to a child, the court held that acts of commission and omission constituted alternative means of committing the same offense, not separate offenses. *Id.* at 312-13. Further, the Court held that dispensing with the unanimity requirement did not violate due process, and thus that the instruction was not required. *Id.* at 313-14, (citing *Schad v. Arizona,* 501 U.S. 624, 649-52, 111 S.Ct. 2491, 2506-07, 115 L.Ed.2d 555 (1991))(Scalia, J., concurring in part and concurring in the judgment).

### *Analysis of Appellant's Jury Charge*

Appellant's charge error complaint is indistinguishable from the issue addressed in *Jefferson.* Here, the only evidence of serious bodily injury was R.B.'s skull fracture and brain injuries. A thorough review of the record fails to uncover any testimony or argument that the rib fractures constituted serious bodily injury. The jury was only required to unanimously agree that R.B. suffered serious bodily injury, they were not required to unanimously agree as to *how* the skull fracture and brain injuries were caused. The five alternate means of committing the act that resulted in R.B.'s severe head injuries does not require jury unanimity. We hold there was no error in the charge.

Accordingly, Issue Two is overruled.

### 3. *Allowing R.B. in the courtroom*

#### A. *R.B. present during Grandmother's testimony*

*Standard of Review*

As previously noted, the admission of evidence is reviewed by appellate courts through the prism of an abuse of discretion. *Davis,* 329 S.W.3d at 803. Under that standard, a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside the zone of reasonable disagreement or is arbitrary or unreasonable. *Lopez,* 86 S.W.3d at 230.

The trial court allowed R.B. to be present during the testimony of his caregiver and grandmother, Carmen Velasquez. Appellant argues that the trial court erred in allowing R.B. to be present in the courtroom during his grandmother's testimony because R.B. belongs in a "special category of inflammatory evidence." Appellant asserts that allowing R.B. to be treated as an "exhibit" was "more prejudicial than probative, inflammatory, and a play for" jurors' sympathies. Relying on the Court of Criminal Appeals opinion in *Erazo v. State,* Appellant contends that he is entitled to a new trial because R.B.'s mere presence in the courtroom was so prejudicial as to irrationally impact the jury. 144 S.W.3d at 492-96.

According to the Texas Rules of Evidence 401, evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. TEX.R.EVID. 401. Nevertheless, relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX.R.EVID. 403. Rule 403 "favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Dawkins v. State*, No. 08-13-00012-CR, 2016 WL 5957311, at *10 (Tex.App.--El Paso Oct. 14, 2016, no pet.)(citing *Gallo v. State*, 239 S.W.3d 757, 762 (Tex.Crim.App. 2007)). The presumption is relevant evidence will be more probative than prejudicial. *Young v. State,* 283 S.W.3d 854, 876

24

(Tex.Crim.App. 2009), *cert. denied,* 558 U.S. 1093, 130 S.Ct. 1015, 175 L.Ed.2d 622 (2009). Under a Rule 403 analysis, we consider:   (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence.   *Erazo*, 144 S.W.3d at 489, (citing *Montgomery*, 810 S.W.2d at 389-90).

Photos and testimony which explain and illustrate the nature of the injuries caused by a defendant have been held to be fairly prejudicial, and Rule 403 does not bar their admission. *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex.Crim.App. 1999).   Moreover, visual evidence accompanying oral testimony goes hand-in-hand to allow the jury to completely understand the extent and nature of the injuries.   This type of evidence is not considered cumulative because it allows the fact finder to compare the credibility of a witness and the validity of his conclusions. *Id.*   Photographs depicting matters described by admissible testimony are generally admissible; but, not every photograph related to admissible testimony is itself admissible.   *See Erazo,* 144 S.W.3d at 489, (citing *Martin v. State*, 475 S.W.2d 265, 267 (Tex.Crim.App. 1972).   We must consider "[t]he availability of other means of proof and the circumstances unique to each individual case . . . . "   *Dawkins*, 2016 WL 5957311, at *11, (citing *Gallo*, 239 S.W.3d at 762).   A photograph should "add something that is relevant, legitimate, and logical to the testimony that accompanies it and that assists the jury in its decision-making duties."   *Id*., (citing *Erazo*, 144 S.W.3d at 491-92).   If a particular photograph is helpful to the jury, that photograph is admissible so long as the emotional and prejudicial aspects do not substantially outweigh the probative or helpful aspects.   *Id*., (citing *Erazo*, 144 S.W.3d at 491–92).

Appellant argues that the probative value of R.B.'s courtroom appearance was substantially outweighed by its unfairly prejudicial visual of him "severely disabled and in a wheelchair, blind, underdeveloped, and require[ing] 24/7 care." In so arguing, he analogizes it to the erroneous admission of photographs of deceased fetuses in *Erazo*. 144 S.W.3d at 492.

We disagree and find R.B.'s courtroom appearance is distinguishable from the photographs admitted in *Erazo*. *Erazo* was a prosecution for the murder of a pregnant woman. The trial court admitted into evidence a photograph depicting the deceased fetus of the murder victim. *Erazo*, 144 S.W.3d at 488. In *Erazo*, it was an autopsy photograph of the fetus. 144 S.W.3d at 488. The court of criminal appeals held the trial court erred by admitting the photographs because any probative value was substantially outweighed by their unfairly prejudicial nature. *Erazo*, 144 S.W.3d at 496. The *Erazo* Court found the photograph was erroneously admitted because it was a photograph of an unborn child "whose death the defendant" was not being tried for. *Id.* at 494. The *Erazo* Court noted that autopsy photographs of the an actual victim is relevant. *See id.*

However, Appellant's reliance on *Erazo* is misplaced. In this case, R.B. is the actual victim and his appearance in the courtroom with the full extent of his disabilities on display is certainly emotional and prejudicial, but does not substantially outweigh the probative value of seeing the extent of his injuries. R.B.'s severe and extreme disabilities are the result of the offense and it was in the nature of the offense that he sustained these life-long, permanent deficits rendering him in the condition that the jury was fully able to appreciate by his short, momentary presence in the courtroom.

We do not find the trial court's ruling allowing the jury to view R.B. in his present medical condition to be an abuse of discretion. This sub-issue of Issue Three is overruled.

26

*B.  R.B. present during Closing Arguments at Punishment*

*Standard of Review*

A trial court's denial of a motion for mistrial is reviewed under an abuse of discretion standard, and the ruling must be upheld unless it is outside the zone of reasonable disagreement. *Coble v. State,* 330 S.W.3d 253, 292 (Tex.Crim.App. 2010); *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex.Crim.App. 2009).   Because a mistrial is a drastic remedy, it is only required when an "error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Wood v. State,* 18 S.W.3d 642, 648 (Tex.Crim.App. 2000)(quoting *Ladd v. State,* 3 S.W.3d 547, 567 (Tex.Crim.App. 1999), *cert. denied,* 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000)). Thus, a mistrial "is a remedy appropriate for . . . highly prejudicial and incurable errors."   *Wood,* 18 S.W.3d at 648.

As Appellant concluded his closing argument for punishment, the State began to address the jury when R.B. was brought back into the courtroom.   Appellant argues that the State's act in wheeling R.B. into the courtroom for the second time during punishment closing arguments was extraordinarily prejudicial.   He contends the trial court erred in denying his motion for mistrial. We disagree.

While the sight and presence of R.B. is prejudicial, the State argues that he is the victim and simply displays the disabilities as the result of the offense that Appellant was charged with. The jury was given a prior opportunity to observe R.B. and we find the short period of time he was present in the courtroom during closing argument not extraordinarily prejudicial or incurable error, if at all.   If a video, such as a day in the life of R.B., was admitted, the jury would be free to review during deliberations, or used by the State in closing argument.   If as Appellant maintains, R.B.

27

was an exhibit, the State can properly refer to an admitted exhibit during closing.

We do not find that the trial court's denying the motion for mistrial is an abuse of discretion. Issue Three is overrule in its entirety.

## C. *Admission of Brito's Video-Recorded Statement*

In his last issue, Appellant challenges the trial court's ruling on the motion to suppress his video-recorded statement. Appellant contends that the admission of his statements violated federal law under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). According to Appellant, he "unambiguously told police officers that he did not waive his rights before the officers continued to question him[.]" The State responds that Appellant was not in custody at the time the video-recorded statement was made.

### *Standard of Review*

We review a trial court's ruling refusing to suppress evidence for an abuse of discretion. *Crain v. State,* 315 S.W.3d 43, 48 (Tex.Crim.App. 2010); *Ramos v. State,* 245 S.W.3d 410, 417-18 (Tex.Crim.App. 2008). In reviewing the trial court's decision, we view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly,* 204 S.W.3d 808, 818 (Tex.Crim.App. 2006). We afford almost total deference to a trial court's determination of historical facts, but review pure questions of law *de novo. Alford v. State,* 358 S.W.3d 647, 652 (Tex.Crim.App. 2012). Likewise, we give almost total deference to a trial court's resolution of mixed questions of law and fact if those questions turn on the credibility and demeanor of witnesses. *Id.* However, if credibility and demeanor are not necessary to the resolution of a mixed question of law and fact, we review the question *de novo. See id.*; *Young v. State,* 283 S.W.3d 854, 873 (Tex.Crim.App. 2009). This same deferential standard of review applies to a trial court's

28

determination of historical facts, demeanor, and credibility even when that determination is based on a videotape recording. *State v. Duran,* 396 S.W.3d 563, 570 (Tex.Crim.App. 2013). We apply "(1) a deferential standard of review to the trial court's factual assessment of the circumstances surrounding the interrogation, and (2) a *de novo* review to its ultimate legal determination that appellee was in custody." *State v. Saenz,* 411 S.W.3d 488, 494 (Tex.Crim.App. 2013)(citing *State v. Ortiz,* 382 S.W.3d 367, 372 (Tex.Crim.App. 2012)).

The law is well-settled that law enforcement officers are required to warn an individual of certain constitutional rights if the individual is considered to be the subject of "custodial interrogation." *Allen v. State*, 479 S.W.3d 341, 348 (Tex.App.--El Paso 2015, no pet.)(citing *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)). However, *Miranda* does not apply if the complained-of statements are not a result of a custodial interrogation. *Dowthitt v. State,* 931 S.W.2d 244, 263 (Tex.Crim.App. 1996); *see also Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)(*Miranda* warnings are only required when there has been such a restriction on a person's freedom as to render him "in custody"). Likewise, Article 38.22 provides that no oral statement of an accused "made as a result of custodial interrogation" is admissible unless the accused is warned of his rights during the recording but before making the statement, and the accused knowingly, intelligently, and voluntarily waives those rights. TEX.CODE CRIM.PROC.ANN. art. 38.22, §§ 2(a), 3(a)(2)(West 2018). Article 38.22 specifically provides that it does not preclude the admission of statements that do not stem from custodial interrogation. *Id.,* at § 5.

Appellant has the initial burden to establish that his statements were the result of a custodial interrogation. *Herrera v. State,* 241 S.W.3d 520, 526 (Tex.Crim.App. 2007). Thus, the State is

29

not required to "show compliance with *Miranda . . . unless and until* the defendant proves that the statements he wishes to exclude were the product of custodial interrogation."  [Emphasis in orig.]. *Id.* at 526, (citing *Wilkerson v. State,* 173 S.W.3d 521, 532 (Tex.Crim.App. 2005)).  The trial court's determination whether Appellant was in "custody" for purposes of *Miranda* presents a mixed question of law and fact.  *Id.* at 526-27, (citing *Thompson v. Keohane*, 516 U.S. 99, 112-13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)).  As noted in *Allen,* "[t]he trial court's ruling will be upheld it if is reasonably supported by the record and is correct under any theory of law applicable to the case."  *Allen,* 479 S.W.3d at 348, (citing *Ramos v. State,* 245 S.W.3d 410, 418 (Tex.Crim.App. 2008)); *see also Valtierra v. State,* 310 S.W.3d 442, 447-48 (Tex.Crim.App. 2010).

*Custodial Interrogation*

The threshold issue is whether Appellant's video-recorded interview amounted to a custodial interrogation.  "[C]ustodial interrogation" means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  *Allen,* 479 S.W.3d at 348, (quoting *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612).  A "person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest."  *See Dowthitt,* 931 S.W.2d at 254, (citing *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 1528-30, 128 L.Ed.2d 293, 298-99 (1994)); *see also Herrera,* 241 S.W.3d at 526, (treating the requirement of "custody" under *Miranda* consistently with the requirement of custody under Article 38.22 of the Texas Code of Criminal Procedure).  Therefore, an investigative detention that is characterized by a lesser degree of restriction on the individual's

30

movement than an arrest, does not constitute custody for purposes of *Miranda,* regardless of the defendant's subjective beliefs. *Bartlett v. State,* 249 S.W.3d 658, 669 (Tex.App.--Austin 2008, pet. ref d).

The U.S. Supreme Court and the Texas Court of Criminal Appeals have made it abundantly clear that whether an accused was subject to a custodial interrogation depends on the "objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury,* 511 U.S. at 323, 114 S.Ct. at 1529; *Dowthitt,* 931 S.W.2d at 254. The determination must be based on whether a reasonable person under the circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Allen,* 479 S.W.3d at 349, (citing *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995)). In addition, the "reasonable person" standard presupposes an "innocent person." *Dowthitt,* 931 S.W.2d at 254.

Our courts, state and federal, have also reiterated an officer's subjective view that an individual was in custody or was not free to leave bears upon the custody issue only if the officer's belief is "conveyed, by word or deed, to the individual being questioned," and only to the extent that the communication of those views would affect a reasonable person's understanding of his freedom of action. *See Stansbury,* 511 U.S. at 325, 114 S.Ct. at 1530; *Dowthitt,* 931 S.W.2d at 255, ("*Stansbury* dictates that the officers' knowledge of probable cause be manifested to the suspect."). If the officer's belief is undisclosed, and is not "somehow communicated or otherwise manifested to the suspect," the officer's belief remains wholly irrelevant to the inquiry. *Dowthitt,* 931 S.W.2d at 254, (citing *Stansbury,* 511 U.S. at 324, 114 S.Ct. at 1530).

"The determination of custody is made on an ad hoc basis after considering all of the

31

objective circumstances." *Allen,* 479 S.W.3d at 349, (citing *Dowthitt,* 931 S.W.2d at 255). In making this ad hoc determination, four general situations have been identified that may constitute custody for purposes of determining whether an officer must provide a suspect with *Miranda* warnings*:*

> (1) when the suspect is physically deprived of his freedom of action in any significant way;
>
> (2) when a law enforcement officer tells the suspect that he cannot leave;
>
> (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and
>
> (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

*Id.,* (citing *Dowthitt,* 931 S.W.2d at 255). The first three situations require the restriction on a suspect's freedom of movement to reach "the degree associated with an arrest" instead of an investigative detention. *In re J.T.M.,* 441 S.W.3d 455, 462 (Tex.App.--El Paso 2014, no pet.) (citing *Saenz,* 411 S.W.3d at 496; *Dowthitt,* 931 S.W.2d at 255-57). The fourth situation, in which probable cause exists for an arrest, requires a showing that the officer manifested his knowledge of probable cause to the suspect by word or act. *Id.,* (citing *Saenz,* 411 S.W.3d at 496; *Dowthitt,* 931 S.W.2d at 255); *see Stansbury,* 511 U.S. at 325, 114 S.Ct. at 1530 (an officer's knowledge or beliefs regarding probable cause may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned). Additionally, custody is not established by the fourth factor, unless the manifestation of probable cause combined with other circumstances of the interview, such as duration or factors of the exercise of police control over a suspect, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *In*

32

*re J.T.M.,* 441 S.W.3d at 462, (citing *Saenz,* 411 S.W.3d at 496; *Dowthitt,* 931 S.W.2d at 255-57).

*In Custody or Not?*

Appellant asserts that he was in police custody during the interrogation.  He states that he could not leave absent permission from police, that he was viewed as the primary suspect and that he was given his *Miranda* warnings.

After reviewing the video-recorded questioning of Appellant, we cannot conclude that it would meet any of the four custodial situations outlined by the Court of Criminal Appeals in *Dowthitt.*  Appellant was not physically deprived of his freedom of action in any significant way, acknowledged he had come to the police station voluntarily with Alicia, and indicated numerous times his understanding that he was not under arrest or being detained and was free to go. Appellant was never physically restrained.  The questioning lasted around forty minutes. Detective Gonzalez did not create a situation that would lead a reasonable person to believe that his freedom of movement was significantly restricted, and in fact, the video indicates he reassured Appellant numerous times he was free to leave.  When Appellant felt the questioning was beginning to focus on him, he got up and left the interview room.  Appellant's freedom of movement was not restricted to any degree associated with an arrest.  Appellant freely engaged with the Detectives in describing the events surrounding his son's injuries and was not restrained in any way when he decided to terminate the interview.

Appellant initially responded to the Detectives he was not waiving his rights under *Miranda,* but twenty seconds later he assents to a formal interview limited to the discussion he had the day before with the Detectives and states his understanding stating "Ok, but no more further than that, right? Because I want my rights" and "Alright, that's fine" nodding his head

affirmatively. When questioned whether he fully understands his *Miranda* rights Appellant states "Yes." The Court of Criminal Appeals has recognized that when a suspect is not in custody, law enforcement officials have no obligation under *Miranda* to meticulously honor a request to terminate questioning, but rather the police "are free to attempt to persuade a reluctant suspect to talk, and the immediate termination of the interrogation after the invocation of rights is simply not required." [Footnotes omitted]. *Estrada v. State,* 313 S.W.3d 274, 296 (Tex.Crim.App. 2010)(quoting *Davis v. State,* No. AP–74,393, 2007 WL 1704071, at *5 (Tex.Crim.App. June 13, 2007)(Womack, J., joined by Price, Johnson, Holcomb, and Cochran, JJ.)(not designated for publication)).

Reviewing the video-recorded interview in its totality, we conclude that the objective circumstances of the questioning were noncustodial in nature, and therefore Appellant's statements did not stem from a custodial interrogation and he was not improperly deprived of his rights and warnings under *Miranda*. This case is similar to many cases considered by the United States Supreme Court and the Court of Criminal Appeals, all of which have come to the conclusion that the accused was not in custody during questioning, and thus not entitled to *Miranda*.[2] In each of these cases, the accused voluntarily came to the police station, was either told he or she was not under arrest or was free to leave, was told he or she did not have to answer any questions, and then the accused was allowed to leave the station house after making incriminating statements.

*Waiver of Miranda Rights*

---

[2] *See, e.g., California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Oregon v. Mathiason,* 429 U.S. 492, 493–95, 97 S.Ct. 711, 713-14, 50 L.Ed.2d 714 (1977); *Estrada v. State,* 313 S.W.3d 274, 288-95 (Tex.Crim.App. 2010); *Gardner v. State,* 306 S.W.3d 274, 293-95 (Tex.Crim.App. 2009); *Meek v. State,* 790 S.W.2d 618, 620 (Tex.Crim.App. 1990).

Contrary to Appellant's assertion that he did not waive his *Miranda* rights, the video-recording reflects that Appellant understood his *Miranda* rights and was freely, voluntarily waiving those rights. Thus, *in arguendo,* even if Appellant was "in custody," he waived his constitutional rights under *Miranda*. The State has the burden of showing that a defendant knowingly, intelligently, and voluntarily waived his Miranda rights. *See Miranda*, 384 U.S. at 444; *Hill v. State*, 429 S.W.2d 481, 486 (Tex.Crim.App. 1968). The State must prove waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). A waiver of a defendant's *Miranda* warnings "can be clearly inferred from the actions and words of the person interrogated." *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). The question is whether Appellant waived his *Miranda* rights knowingly, intelligently, and voluntarily. *Id.*

In evaluating if Appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights we look to the standard outlined in *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). First, the relinquishment of the right must be voluntary, that demonstrates that it is the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must be executed with complete awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" shows both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Id; see also Butler,* 441 U.S. at 375-76, 99 S.Ct. at 1758-59.

The totality of the circumstances surrounding the interrogation shows Appellant's waiver was voluntary. That is, the waiver resulted from a free and deliberate choice without intimidation,

coercion, or deception.   Just as soon as Detective Gonzalez informed Appellant he needed to waive his *Miranda* rights in order to discuss the circumstances surrounding his son's hospitalization, Appellant immediately agreed if the interview was limited only to matters they had previously discussed.   Appellant willingly participated in the interview and physically demonstrated how he attempted to resuscitate the baby and accidently hit R.B.'s head on the arm of the sofa.   At no time during the video-recording did Appellant request an attorney or request that the interview be stopped until he voluntarily left the interview room.   In fact, Appellant was eager to share his version of the events, including how he tried to save his baby by performing CPR all the while taking direction from the 911 operator.   Furthermore, the record shows no evidence of intimidation or coercion.   The lack of intimidation and coercion can be seen during the interview when Appellant felt comfortable enough using a doll to demonstrate how he handled the baby while administering CPR and how hard he bumped the baby's head.   Appellant relied on Gonzalez's statement that he was free to leave, and voluntarily terminating the interview suggests that the information he did choose to provide was given voluntarily.   There is nothing in the record that raises any possibility that a promise from the Detectives that could have jeopardized the voluntariness of Appellant's statement.

The totality of the circumstances surrounding the interrogation shows Appellant's waiver was made with full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them.   At the start of the interview, Detective Gonzalez had Appellant read the *Miranda* warnings out-loud in the video-recording.   Gonzalez told Appellant he could read them in English or Spanish.   Once the agreement was struck by Appellant as to the limits of the interview, Appellant unequivocally stated he understood his rights.   The

36

warnings read by Appellant made him fully aware of the rights set forth in *Miranda*, as well as the results of waiving those rights. That Appellant terminated the interview when pressed by the Detectives as to how the baby was injured also clearly shows the voluntariness of the video-recorded statement in addition to his level of awareness of his constitutional rights. His action in terminating the interview, walking out, and stating "This is going to end here because you are trying to push it on me" attests to his understanding of the impact of the waiver of his *Miranda* rights. The totality of the circumstances shows that Appellant did knowingly, intelligently, and voluntarily waive his rights under *Miranda.*

Issue Four is overruled.

### Conclusion

Having overruled Appellant's four issues, the trial court's judgment is affirmed.

July 25, 2018

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.
Hughes, J. (Not Participating)

(Do Not Publish)

37